# SHAFER, AS ATTORNEY GENERAL OF THE STATE OF NORTH DAKOTA, ET AL. v. FARMERS GRAIN COMPANY OF EMBDEN, ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF NORTH DAKOTA.

No. 34. Argued May. 4, 1923. Reargued March 2, 3, 1925.—Decided May 4. 1925.

1. The right to buy wheat with or without dockage, for shipment, and to ship it, in interstate commerce is a common right, the regulation of which is committed to Congress and denied to the States by the Commerce Clause of the Constitution. P. 198.

2. The North Dakota Grain Grading Act, N. Dak. Ls. 1923, 549, assuming control over wheat buying in the State, of which 90% is for interstate shipment, provides, *inter alia:* That grain bought by grade (the established practice) must be graded by licensed inspectors; that (contrary to the general practice) the buyer must separate the dockage and return it to the producer, unless distinctly valued and paid for; that buyers having and operating grain elevators must give bond to the State, if buying on credit, must keep records of all wheat bought, showing grade given and price paid at the elevator and grade fixed and price paid at terminal market (outside the State), and must furnish such data to a state supervisor when requested; that the supervisor shall in a general way investigate and supervise the marketing of the grain with a view to preventing various things deemed unjust or fraudulent, including unreasonable margins of profit and confiscation of dockage; and shall have authority to make and enforce

such orders, rules and regulations as may be necessary to carry out all the provisions of the Act. *Held* a direct interference with and burden upon interstate commerce, and an attempt by the State to prescribe rules under which an important part of such commerce shall be conducted. P. 199.

3. The act cannot be supported as an attempt, through inspection regulations, to assist in carrying out the purposes of the United States Grain Standards Act. P. 202.

Affirmed.

APPEAL from an interlocutory decree of the District Court enjoining officials of the State of North Dakota from enforcing provisions of the State Grain Grading Act against the plaintiffs who were numerous owners and operators of county elevators within the State, including some farmers' cooperative companies, and engaged in the business of buying grain from the farmers for shipment to markets in other States.

*Mr. Seth W. Richardson,* Special Assistant to the Attorney General of North Dakota, with whom *Mr. George F. Shafer,* Attorney General, was on the brief, for appellant.

The North Dakota Grain Grading Act is a police measure, enacted by the State for the protection of the welfare, happiness and prosperity of its citizens. It places upon interstate commerce no real or substantial burden or interference.

The act is intended to be cooperative with the Federal Grain Standards Act, by effectuating the establishment and promulgation of the grades and standards thereof, at the local elevator point—an evil at present not covered by the administration of the federal act, but one which is left to the local or state authorities.

Properly construed, the North Dakota act does not conflict with the federal act, but is harmonious and cooperative.

The provision of the state law requiring a license to grade grain, to be issued by either the federal government

or the state government, operates and takes effect while the grain is wholly within the domain of state authority, and prior to the inception of interstate commerce.

*Mr. David F. Simpson,* with whom *Messrs. H. A. Libby, John Junell, James E. Dorsey, Egbert S. Oakley, Robert Driscoll* and *William A. Lancaster* were on the briefs, for appellees.

Mr. Justice VAN DEVANTER delivered the opinion of the Court.

This is a suit to restrain the enforcement of the North Dakota Grain Grading Act, an initiated measure approved at a state election November 7, 1922. North Dakota Laws 1923, p. 549. The plaintiffs own and operate country elevators within the State, at which they buy wheat from farmers for shipment to markets in other States; and the defendants are officers of the State, who are charged by the Act with the duty of enforcing it. The plaintiffs challenge the validity of the Act under the Constitution of the United States on the grounds, first, that it interferes with and burdens interstate commerce, and, secondly, that it conflicts with the United States Grain Standards Act, c. 313, 39 Stat. 482. An injunction preventing its enforcement pending the suit was granted by the District Court, three judges sitting; and that interloctory decree is here for review under section 266 of the Judicial Code, as amended March 4, 1913, c. 160, 37 Stat. 1013.

A prior statute concededly " having the same general purpose " was adopted by the state legislature in 1919 and held invalid by this Court in *Lemke* v. *Farmers Grain Company,* 258 U. S. 50, as an interference with interstate commerce. There are differences between that statute and the present one, of which the parties take divergent views. It would serve no purpose to take up

these differences in detail. We shall describe the situation to which the present Act is intended to apply, state its material provisions, and then come to its operation on interstate commerce.

Wheat is the chief product of the farms of North Dakota, the annual crop approximating 150,000,000 bushels. About 10 per cent. is used and consumed locally, and about 90 per cent. is sold within the State to buyers who purchase for shipment, and ship, to terminal markets outside the State. Most of the sales are made at country elevators to which the farmers haul the grain when harvested and threshed. These elevators are maintained and operated by the buyers as facilities for receiving the grain from the farmers' wagons and loading it into railroad cars. The loading usually proceeds as rapidly as grain of any grade is accumulated in carload lots and cars can be obtained. When a car is loaded it is sent promptly to a terminal market and the grain is there sold. This is the usual and recognized course of buying and shipment. Occasionally a farmer has his grain stored in the country elevator, or shipped to a terminal elevator for storage, and awaits a possible increase in price; but even in such instances he usually sells to the buyer operating the country elevator, and the latter then sends the grain to the terminal market if it has not already gone there.

The price paid at the country elevators rises and falls with the price at the terminal markets, but is sufficiently below the latter to enable the country buyer to pay for the intermediate transportation and have a margin of profit. All transactions at the terminal markets, including the price, are based on the grade of the wheat, and by reason of this all buying at the country elevators is by grade.

The grading at the terminal markets is done by inspectors licensed under the United States Grain Stand-

ards Act, who are required to apply to all interstate shipments the grading standards promulgated under that Act by the Secretary of Agriculture. There are no inspectors licensed under that Act at the country elevators; and so the grading is done there unofficially by the buyers or their agents as an incident and part of the buying.

Grading includes an ascertainment of the proportions of clean wheat and of dockage in each lot of grain and an ascertainment of the quality of the wheat. Dockage consists of separable foreign material, such as dirt, pieces of straw, chaff, weed stems, weed seeds and grain other than wheat. Its proportion varies in different lots, but generally is less than five per cent. When not separated it causes the grain to bring a lower price per bushel than clean wheat would bring. When separated it has a value for poultry and stock feed which usually is in excess of the cost of separation. Occasionally the farmer separates it at the farm and sells only the clean wheat, and occasionally the buyer separates it at the country elevator, charges the farmer for that service, and buys and ships only the clean wheat; but generally the grain is sold by the farmer and shipped by the country buyer with the dockage included. The influence of dockage on the value of the grain and the current modes of handling it are shown in publications of the Agricultural Department of the United States, pertinent excerpts from which are set out in the margin.[1]

---

[1] Extracts from Farmers' Bulletin No. 1118, United States Department of Agriculture, pp. 5, 21:

" The foreign material in wheat may seriously affect its value in that it often increases the cost of milling, and causes injury to the baking qualities of flour. Therefore, that factor is considered in the inspecting and grading of wheat. The amount of dockage present has a bearing upon the commercial value of a lot of wheat. Especially when present in large amounts, it is a factor of considerable importance to the parties interested in the marketing or storage of grain."

As many as 2,200 country elevators are operated within the State in the business here described—generally two or more by competing buyers at each station. Some of the buyers are individuals and others are corporations. A large number are farmers' cooperative companies, which buy grain grown by their stockholders and others in the vicinity of their elevators, ship and sell the same, and distribute as patronage dividends the surplus arising from such transactions—no profit being retained by the companies.

The plaintiffs comprise many buyers, individual and corporate, including 11 farmers' cooperative companies. In the aggregate they own and operate several hundred country elevators, widely distributed over the State, and buy and ship about 30,000,000 bushels of wheat a year. They carry on the business severally, each buying and

---

"All of the following methods of handling dockage are employed in normal times and all are generally found to be satisfactory:

1. The wheat is cleaned on the farm and only the clean wheat is hauled to market.

2. The wheat delivered by the farmer is run over the proper cleaning machinery at the country elevator or mill, and the dockage is separated and returned to the farmer.

3. The wheat is screened by the local buyer, payment is made to the seller on the basis of the grade of the clean wheat only, and the dockage is retained by the elevator or mill as compensation for services in removing it.

4. The wheat is screened by the local buyer, payment is made to the seller on the basis of the grade of the clean wheat, and the dockage is retained by the elevator or mill, and if the value of the dockage separated exceeds the cost of separation, payment is made for it.

5. The wheat containing the dockage is consigned to the large market by the country mill or elevator, where the dockage is separated and its value is taken into consideration in connection with the price paid for the entire carload of dockage-free wheat   In some localities it is the practice to make a small charge for such services, while in other localities the services are performed without cost.

shipping independently of the others. All buy with the purpose of shipping to and selling in terminal markets outside the State and carry out this purpose in the manner already described.

The North Dakota Act in terms covers all farm products, but as it is chiefly aimed at dealings in wheat and the parties have discussed it on that basis, our statement of its provisions will be shortened by treating them as if relating only to wheat.

The title to the Act describes it as one whereby the State undertakes (a) " to supervise and regulate the marketing " of wheat, (b) to prevent " unjust discrimination, fraud and extortion in the marketing " of such grain, and (c) to establish " a system of grading, weighing and measuring " it. The first section declares the purpose of the State to encourage, promote and safeguard the pro-

---

6. The wheat containing the dockage is sold to a local buyer, who in turn consigns it to the terminal market with the understanding that the price secured will be based upon the commercial value of both the wheat and the dockage.

The first two methods mentioned, in which only the screened wheat is delivered to the local buyer, tend to minimize the differences of opinion with regard to the grade of wheat delivered and therefore establish greater confidence in the grades given by the local buyer. Furthermore, these methods enable the farmer to utilize the foreign material for feed or to sell it locally."

Extracts from Farmers' Bulletin No. 1287, United States Department of Agriculture, pp. 5, 21:

" The benefits derived from clean wheat are shared by the farmer and the country elevator. If the farmer cleans his wheat before delivering it to the elevator he saves the cost of hauling the dockage to market, and he may be able to use it to advantage for feed, and make a saving in his feed bill. In many cases these savings will repay the farmer for the time and trouble required to clean his wheat. The contention as to the amount of dockage in the wheat which frequently arises between the farmer and the elevator operator will be avoided if clean wheat is delivered. The price paid for clean wheat at the elevator is usually more per bushel than the price paid for unclean wheat, because the elevator operator

duction of wheat and commerce therein by establishing
a uniform system of grades, weights and measures. The
second and third sections provide for a State Supervisor
of Grades, Weights and Measures and give him authority
to make and enforce necessary orders, rules and regula-
tions to carry out the provisions of the Act.

The fourth section provides that the Supervisor shall
establish a system of grades, weights and measures for
wheat " and shall in a general way investigate and super-
vise the marketing of same with a view of preventing un-
just discrimination, unreasonable margins of profit, con-
fiscation of valuable dockage, fraud and other unlawful
practices "; declares that whenever grades, weights and
measures for wheat are established by the Secretary of
Agriculture under the United States Grain Standards Act
they shall become the grades, weights and measures of ·

must consider either the cost of removing the dockage or the freight
charges on it to the terminal market."

" The farm is the logical place to clean wheat, preferably as part
of the thrashing operation, because the necessary power is avail-
able and later handling is avoided. Since satisfactory cleaning is
not always possible under present conditions at thrashing time,
other means of cleaning must be used.

The fanning mill is the most practical cleaning machine for farm
use, and if properly adjusted and operated will clean wheat satis-
factorily for commercial purposes with but little loss of wheat in
the screenings."

" The operators of country elevators are beginning to realize more
keenly each year that it pays to clean wheat before shipping it
to the terminal markets. Many of the country elevators not only
clean wheat for themselves but for the farmers as well. The latter
is known as ' custom cleaning,' for which country elevators located
in the central Northwest ordinarily charge from 2 to 3 cents per
bushel, based on the gross weight of the grain before cleaning. A
higher charge is made for cleaning the grain for seed purposes. The
shrinkage in the weight of the grain is borne by the owner, but
the screenings may be returned to him. The returns from cus-
tom cleaning add a considerable amount to the income of some
country elevators during the year."

the State; and concludes by saying, " In establishing such grades, weights and measures, the value of dockage shall be considered, and the buyer shall not be permitted to retain the same without just compensation. He shall pay the fair market value for same or separate it and return it to the producer." The fifth section provides that no person shall buy any wheat "by grade"—excepting where one producer buys from another producer—unless it has been inspected and graded by a licensed inspector under the provisions of the Act, or those of the United States Grain Standards Act, and is bought by a grade fixed and recognized thereunder.

The sixth section provides for the issue, by the Supervisor, of licenses to grade to persons engaged in buying, weighing and grading wheat—including buyers and agents at country elevators—where they pass a satisfactory examination. Each license is to be held on condition that the licensee shall honestly and correctly determine the grades and dockage and shall likewise weigh the grain. The seventh section authorizes the Supervisor to suspend or revoke any such license where, after investigation, he finds that the licensee is incompetent, knowingly or carelessly has graded grain improperly, has short-weighed it, has taken valuable dockage without compensation, or has violated any provision of the Act or of the United States Grain Standards Act.

The eighth section requires every buyer operating an elevator to obtain from the Supervisor a yearly license, the fee for which is to be adjusted by the Supervisor to the capacity of the elevator at not exceeding $1.00 for each 1,000 bushels. The ninth section requires every elevator operator or individual " buying or shipping for profit," who does not pay cash in advance, to file with the Supervisor a sufficient bond, running to the State, to secure payment for all wheat bought on credit. The tenth section requires every buyer operating an elevator to

keep a record of the wheat bought at the elevator and to show therein the price paid and grades given, and " the price received and the grades received at the terminal markets;" and further requires him to furnish this information to the Supervisor when requested. The twelfth section makes it unlawful for any person to grade wheat who does not have a license therefor under the Act or under the United States Grain Standards Act. And other sections make every violation of the Act a misdemeanor and charge the Attorney General of the State and its other law officers with the duty of prosecuting such violations.

The Act dispenses with grading where the buying is by sample, by type or by certain designations; but this has no bearing here, for the buying for interstate shipment is all by grade. The Act also dispenses with grading by an inspector licensed thereunder, if the grain be graded by an inspector licensed under the United States Grain Standards Act; but this is an idle provision, for there are in North Dakota no inspectors licensed under that Act. Such inspectors are found only at terminal markets, and there is no terminal market in North Dakota.

This statement of the provisions of the Act discloses its full purposes and scope; but some of its features, of special importance here, will be noticed again as we proceed.

Buying for shipment, and shipping, to markets in other States when conducted as before shown constitutes interstate commerce—the buying being as much a part of it as the shipping. We so held in *Lemke* v. *Farmers' Grain Company, supra,* following and applying the principle of prior cases. Later cases have given effect to the same principle. *Stafford* v. *Wallace,* 258 U. S. 495, 516; *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 309.

Wheat—both with and without dockage—is a legitimate article of commerce and the subject of dealings that are nation-wide. The right to buy it for shipment, and

to ship it, in interstate commerce is not a privilege derived from state laws and which they may fetter with conditions, but is a common right, the regulation of which is committed to Congress and denied to the States by the commerce clause of the Constitution.[2]

The decisions of this Court respecting the validity of state laws challenged under the commerce clause have established many rules covering various situations. Two of these rules are specially invoked here—one that a state statute enacted for admissible state purposes and which affects interstate commerce only incidentally and remotely is not a prohibited state regulation in the sense of that clause;[3] and the other that a state statute which by its necessary operation directly interferes with or burdens such commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted.[4] These rules, although readily understood and entirely consistent, are occasionally difficult of application, as where a state statute closely approaches the line which separates one rule from the other. As might be expected, the decisions dealing with such exceptional situations have not been in full accord. Otherwise the course of adjudication has been consistent and uniform.

In our opinion the North Dakota Act falls certainly within the second of the two rules just stated. By it that

---

[2] *Crutcher* v. *Kentucky,* 141 U. S. 47, 57; *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, 21; *Oklahoma* v. *Kansas Natural Gas Co.,* 221 U. S. 229, 260; *Buck Stove Co.* v. *Vickers,* 226 U. S. 205, 215; *Adams Express Co.* v. *New York,* 232 U. S. 14, 31; *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 291, 292.

[3] *Sherlock* v. *Alling,* 93 U. S. 99, 102–104; *Kidd* v. *Pearson,* 128 U. S. 1, 22 *et seq.; Geer* v. *Connecticut,* 161 U. S. 519, 532; *Sligh* v. *Kirkwood,* 237 U. S. 52, 59–61.

[4] *Crutcher* v. *Kentucky,* 141 U. S. 47, 56, 58; *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, 27; *International Paper Co.* v. *Massachusetts,* 246 U. S. 135, 141; *Western Union Telegraph Co.* v. *Foster,* 247 U. S. 105, 114; *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 596; *Air-Way Corporation* v. *Day,* 266 U. S. 71, 81.

State attempts to exercise a large measure of control over all wheat buying within her limits. About 90 per cent. of the buying is in interstate commerce. Through this buying and the shipping in connection with which it is conducted the wheat which North Dakota produces in excess of local needs—more than 125,000,000 bushels a year—finds a market and is made available for consumption in other States where the local needs greatly exceed the production. Obviously therefore the control of this buying is of concern to the people of other States as well as to those of North Dakota.

Only by disregarding the nature of this business and neglecting important features of the Act can it be said to affect interstate commerce only incidentally and remotely. That it is designed to reach and cover buying for interstate shipment is not only plain but conceded. To conform to recognized commercial practices such buying must be by grade, and it is so conducted. The Act prevents buying by grade, unless the buyer secures from the State a grading license for himself or his agent. The general practice is to buy and ship without separating the dockage from the wheat, the price paid carrying a right to both. The Act requires the buyer to separate the dockage and return it to the producer, unless it be distinctly valued and paid for. A failure to comply with this or any other requirement of the Act is made cause for revoking the grading license. It is practically essential that the buyers have and operate elevators as facilities for handling and loading the wheat. The act requires every such buyer to give to the State, if he buys on credit, a bond securing payment for all wheat so purchased; to keep a record of all wheat bought, showing the grade given and price paid at his elevator and the grade fixed and price received at the terminal market; and to furnish such data to the State Supervisor when requested. The Act also intends and declares that the State Supervisor

" shall in a general way investigate and supervise the
marketing " of the grain with a view of " preventing ".
various things deemed unjust or fraudulent, including
" unreasonable margins of profit " and " confiscation of
valuable dockage;" and, to the end that this and other
provisions may be made effective, the Act invests him
with authority to make and enforce such orders, rules and ·
regulations as may be necessary to carry out all of its
provisions.

We think it plain that, in subjecting the buying for
interstate shipment to the conditions and measure of con-
trol just shown, the Act directly interferes with and
burdens interstate commerce, and is an attempt by the
State to prescribe rules under which an important part
of such commerce shall be conducted. This no State can
do consistently with the commerce clause.

The defendants cite several cases as making for a dif-
ferent conclusion, but we do not so read them. In some
the commerce clause was in no way involved, and those
in which it was involved give no support to what is at-
tempted in the Act now before us. In *Munn* v. *Illinois,*
94 U. S. 113, 123, 135, the question was whether, as re-
spects an elevator devoted to storing grain for hire, the
State could regulate the storage charge where part of the
grain reached the elevator, or was destined to leave it,
through the channels of interstate commerce. The Court
held such a regulation admissible because of the public
character of the elevator and because interstate commerce
was affected only incidentally and remotely. No restric-
tion on buying or shipping was involved. In *Cargill Co.*
v. *Minnesota,* 180 U. S. 452, the Court had before it a
state statute, much of which had been pronounced un-
constitutional by the state court. In sustaining a pro-
vision which remained, the Court said, p. 470: " The
statute puts no obstacle in the way of the purchase by
the defendant company of grain in the State oi the ship-

ment out of the State of such grain as it purchased."
Plainly the case is not in point here. In *Merchants Exchange* v. *Missouri,* 248 U. S. 365, the statute involved
required that public weighers appointed for the purpose
should do the weighing and issue weight certificates at
elevators used for storing or transferring grain for hire,
and prohibited any other person from issuing weight certificates at an elevator where a public weigher was stationed. Objection was made to the prohibition on the
ground that as applied to grain received from or shipped
to points without the State it burdened interstate commerce. Of course the objection was overruled, the
statute being an admissible regulation of the business of
conducting an elevator for hire, like the statute considered
in *Munn* v. *Illinois.*

The defendants make the contention that we should
assume the existence of evils justifying the people of the
State in adopting the Act. The answer is that there can
be no justification for the exercise of a power that is not
possessed. If the evils suggested are real, the power of
correction does not rest with North Dakota but with Congress, where the Constitution intends that it shall be exercised with impartial regard for the interests of the
people of all the States that are affected.

The defendants further contend that the Act is simply
an attempt on the part of the State, through inspection
regulations, to assist in carrying out the purposes of the
United States Grain Standards Act. We think the Act
discloses an attempt to do much more. To require that
dockage be separated by the buyer and be returned to the
producer unless it be distinctly valued and paid for is not
inspection. Nor does the federal Act contain or give support to such a requirement. To exclude one from buying
by grade unless he secures a grading license for himself or
his agent is apart from what usually is comprehended in
inspection. Nothing like this is found in the federal Act.

On the contrary, it declares that persons licensed to grade under it shall not be. interested in any grain elevator or in buying or selling grain, or be in the employ of any owner or operator of a grain elevator. Equally unrelated to inspection are the provisions exacting a bond to pay for all wheat bought on credit; requiring that a record be kept of the price paid in buying at the local elevator and the price received in selling at the terminal market; and authorizing the State Supervisor to investigate and supervise the marketing with a view to preventing unreasonable margins of profit. None of these finds any example in the federal Act; and their presence in the state Act makes it a very different measure from what it would be without them. Aside from the adoption of the grades established and promulgated under the federal Act, we find little in the state Act to support and much to refute the assertion that it is merely an attempt to carry out the purposes of the federal Act.

For the reasons here given we hold that the Act is a direct regulation of the buying of grain in interstate commerce, and therefore invalid, and that the District Court rightly granted the injunction.

*Decree affirmed.*

Mr. Justice Brandeis dissents.