Marshall, C. J.
 

 The New York, Chicago
 
 &
 
 St. Louis Railroad Company began its action in the court of insolvency of Cuyahoga county to condemn for railroad purposes certain property belonging to Snyder and others. In accordance with Section 11046, General Code, the court first proceeded to determine certain jurisdictional questions relating to the existence of the corporation, its right to make the appropriation, its inability to agree with the owner, and the necessity for the appropriation. The jurisdictional questions were determined in favor of the railroad company, to which exceptions were properly reserved, and thereafter a jury was impaneled and the value of the property was assessed at the sum of $17,325, upon which judgment was entered. Error was then prosecuted to the Court of Appeals, involving only the jurisdictional questions, in which court the judgment was affirmed. The case has been brought into this court on motion to certify, and under claim of right, the controversy involving questions arising under the Constitutions of the United States and the state of Ohio.-
 

 The record presents two jurisdictional questions for determination: First, whether there was proof of inability to agree; and, second, whether the railroad company was a
 
 de jure
 
 corporation.
 

 On the first of these questions it appears that two letters were written by the railroad company making offers of purchase. The property owner did not reply to either of those letters. It is urged on his
 
 *74
 
 behalf that it was useless to do so because the purposes for which the property was to be appropriated had not been definitely made known to the owner, and further, that there was a change in the declared purpose, after the first offer. The resolution of the board of directors first authorized the appropriations for railroad purposes. Thereafter a written offer was made stating that the property was desired for sidetracks and depot. Later, a.second offer was made which stated the same purpose. After the second offer was made, the directors amended the resolution, stating that the land was desired to be used for the purpose of sidetracks. It is the contention of the property owner that he was entitled to be definitely advised as to the purpose for which the land was to be used.
 

 It is apparent that this branch of the inquiry is involved in technicalities. Cases are cited to the effect that the landowner is entitled to be advised of the purposes for which the property is to be used,, and that this information must be given either before or as a part of the negotiations for the purchase. Whether Mr. Snyder was advised that the property was to be used for sidetracks alone, or for depot and sidetracks, or for railroad purposes generally can have no particular importance. It is undisputed that Mr. Snyder at all times knew that the property was sought for some feature of railroad service. The railroad company should not be held to the employment of the land for some particular purpose originally had in mind, if the progress of the development requires its use for something slightly different and yet within the general purview of railroad service. The real inquiry on the question of
 
 *75
 
 inability to agree is whether a definite offer was made to an owner who had knowledge of the general purpose for which the property was to be utilized and an opportunity to accept the same before being put to the annoyance and expense of litigation. The insolvency court determined this issue upon evidence against the property owner, and it is impossible that any prejudice could have resulted, because the other branch of our inquiry leads irresistibly to the conclusion that the property owner would not have accepted the offer as made, even with definite knowledge of the purpose for which the property would be ultimately utilized.
 

 On the second branch of the inquiry, as to whether the railroad company was entitled to maintain the action, and whether its corporate status was such as to permit it to exercise an attribute of sovereignty, it may be broadly stated that it is a fundamental prerequisite to such right that it be a
 
 de jure
 
 corporation. This principle has been many times affirmed and reaffirmed, not only by the Supreme Court of Ohio, but by the United States Supreme Court and the courts of last resort throughout the Union. The following cases clearly establish that principle:
 
 Tulare Irrigation Dist.
 
 v.
 
 Shepard,
 
 185 U. S., 1, 22 S. Ct., 531, 46 L. Ed., 773;
 
 N. Y. Cable Co.
 
 v.
 
 Mayor, etc., of N. Y.,
 
 104 N. Y., 1, 10 N. E., 332; Atlantic
 
 & Ohio Rd. Co.
 
 v.
 
 Sullivant,
 
 5 Ohio St., 276;
 
 Atkinson
 
 v.
 
 Marietta & Cincinnati Rd. Co.,
 
 15 Ohio St., 21;
 
 City of Cincinnati
 
 v.
 
 L. & N. Rd. Co.,
 
 88 Ohio St., 283, 102 N. E., 951;
 
 Parkside Cemetery Assn.
 
 v.
 
 Clev., B. & G. L. Traction Co.,
 
 93 Ohio St., 161, 112 N. E., 596, Ann. Cas., 1918C, 1051.
 

 It is not doubted in the case at bar that the New
 
 *76
 
 York, Chicago
 
 &
 
 St. Louis Railroad Company was _ regularly incorporated under and in accordance with the laws of each of the states through which it operates, viz., Ohio, New York, Pennsylvania, Illinois, and Indiana, and was so incorporated and organized in 1923; that that corporate status was derived 'from a voluntary consolidation of certain pre-existent railroad companies; and that that consolidation was accomplished by an agreement dated December 28, 1922, under favor of the statutes of the five states above named. It is argued that that agreement of consolidation and the incorporation pursuant thereto in accordance with the laws of the five states did not give the consolidated company a
 
 de jure
 
 existence, because of alleged inhibitions of the Transportation Act of February 28, 1920, particularly Section 407, amending Section 5, par. 6 of the Interstate Commerce Act, Title 49, Section 5, par. 6, U. S. Code (ÍT. S. Comp. Stats. Section 8567), and the admitted noncompliance with its provisions of the railroad companies participating in said consolidation.
 

 The contract of consolidation was entered into between the New York, Chicago & St. Louis Railroad Company, the Chicago
 
 &
 
 State Line Railroad Company, the Lake Erie & Western Railroad Company, the Ft. Wayne, Cincinnati
 
 &
 
 Louisville Railroad Company, and the Toledo, St. Louis & Western Railroad Company. By the terms of that agreement the five constituént companies were consolidated into one corporation to be known as the'New York, Chicago
 
 &
 
 St. Louis Railroad Company. The capital stock of the consolidated company was to be distributed among the stockholders of the former con
 
 *77
 
 stituent companies, as provided in the agreement. The agreement was filed in the office of the secretary of state of each of the five states through which the several lines of railroad would pass, and one copy thereof was filed in the office of the secretary of state of the state of Ohio, and by virtue of Sections 9025 to 9030, inclusive, of the General Code of Ohio, the incorporation became complete and the five- constituent companies became merged into a new single company, and the former companies by the same token became no longer existent. The new company took the place of the old ones and succeeded to their several properties and assumed their several liabilities. Pol
 
 litz
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 49, 117 N. E., 149, L. R. A., 1918D, 166;
 
 Shields
 
 v.
 
 Ohio,
 
 95 U. S., 319, 24 L. Ed., 357;
 
 Wabash, St. Louis & Pac. Ry. Co.
 
 v.
 
 Ham,
 
 114 U. S., 587, 5 S. Ct., 1081, 29 L. Ed., 235.
 

 The requirements of the statutes of Ohio having been fully met, it remains to be determined whether any inhibitions of the Federal Transportation Act of 1920 have been violated. •
 

 Paragraphs 18 to 21, Section 1, of that act (Title 49, Section 1, pars. 18 to 21, IT. S. Code, IT. S. Comp. Stats., Section 8563), provide that no carrier by railroad in interstate commerce shall undertake the extension of its line of railroad, or acquire or operate-any line of railroad or extension thereof, or engage in transportation over such additional or extended line of railroad without first obtaining from the Interstate Commerce Commission a certificate that the present or future public convenience and necessity require the operation of such additional or extended line of railroad, and further require that an
 
 *78
 
 application be made to tbe commission for such certificate, upon which notice shall be given as therein provided, and that without such certificate being granted the operation shall be unlawful and may be enjoined, and that any carrier or agent of any carrier violating the provisions of those paragraphs shall be punishable by fine or imprisonment, or both. Section 20a, as added to Interstate Commerce Act by Section 439 of the same act (Title 49, Section 20a, U. S. Code, U. S. Comp. Stats., Section 8592a), provides that it shall be unlawful for any carrier to issue its capital stock, bonds, or other evidence of indebtedness, unless it first obtains the authority of the Interstate Commerce Commission. Paragraph 7 of that section provides that:
 

 11
 
 The jurisdiction conferred upon the commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein. ’ ’
 

 Paragraph 11 of the same section provides that any securities issued without such authorization shall be void.
 

 The railroad company made application for the certificate and the authority, as required by the foregoing sections, and on June 18, 1923, the Interstate Commerce Commission granted the authority to issue its securities in exchange for all of the issued capital stock of the five constituent companies of the applicant and issued its certificate that the present and future public convenience and necessity require the acquisition and operation by the appli
 
 *79
 
 cant of certain lines of railroad. 79 Interstate Commerce Comm. R., 581.
 

 Counsel for the railroad company contend that it has complied with all of the provisions of the Transportation Act of 1920 necessary to be complied with as a condition precedent to becoming a
 
 de jure
 
 corporation. It is contended by plaintiff in error that the consolidated corporation is not complete, and that it does not have legal status without having obtained the authority of the commission to consolidate its property into one corporation for ownership, management, and operation, as provided by Section 5 of the Interstate Commerce Act, as amended by Section 407 of the Transportation Act (Title 49, Section 5, U. S. Code). The pertinent parts of that section are as follows:
 

 (2) Whenever the commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this chapter, that the acquisition, to the extent indicated by the commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the commission to be just and reasonable in the premises. * * *
 

 “ (4) The commission shall as soon as practicable prepare and adopt a plan for the consolidation of the railway properties of the continental United
 
 *80
 
 States into a limited number of systems. # *
 

 “(5) When the commission has agreed upon a tentative plan, it shall give the same due publicity and upon reasonable notice, including notice to the Governor of each state, shall hear all persons who may file or present objections thereto. * * * After the hearings are at an end, the commission shall adopt a plan for such consolidation and publish the same. * ,x‘ * The consolidations herein provided for shall be in harmony with such plan. *
 
 * *
 

 “(6) It shall.be lawful for two or more carriers by railroad, subject to this chapter, to consolidate their properties or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership, management, and operation, under the following conditions:
 

 “(a) The proposed consolidation must be in harmony with and in furtherance of the complete plan of consolidation mentioned in paragraph (5) and must be approved by the commission,-
 

 “(b) The bonds at par of the corporation which is to become the owner of the consolidated properties, together with the outstanding capital stock at par of such corporation, shall not exceed the value of the consolidated properties as determined by the commission. * * *
 

 “(c)
 
 * *
 
 * If after such hearing the commission finds that the public interest will be promoted by the consolidation and that the conditions of this section have been or will be fulfilled, it may entelan order approving and authorizing such consolidation, with such modifications and upon such terms and conditions as it may prescribe; and thereupon
 
 *81
 
 such consolidation may be effected, in accordance with such order, if all the carriers involved assent thereto, the law of any state or the decision or order of any state authority to' the contrary notwithstanding.”
 

 The New York, Chicago
 
 &
 
 St. Louis Railroad Company has never made application for approval of the consolidation agreement before the Interstate Commerce Commission, and manifestly it has no right to do so until the adoption of a complete plan by the commission. Several applications have been made before the commission, since the approval of the application for certificate of convenience and necessity, and each application has been allowed. On February 26, 1924, an order was made to permit a pledge of bonds. 86 Interst. Com. Comm. R. 465. On June 7, 1924, the commission approved an issue of bonds. 90 Interst. Com. Comm. R. 200. On June 29,1925, the commission approved an issue of securities. 99 Interst. Com. Comm. R. 314. In some of these orders Commissioner Eastman dissented. To the order of June 29, 1925, he apparently gave his approval. The action of the commission, of course, is not decisive in the matter. A tentative plan under paragraph 5 of Section 5 has been drawn by the commission, but the complete plan has not been formulated or approved. Applications have been made by other applicants for approval of consolidation before the commission, but the commission has not in any instance allowed any such application, it clearly having no right to do so. The opinions of the majority of the commission and dissenting opinion of Commissioner Eastman, in 79 Interst. Com. Comm. R. 581, make it clear that upon con
 
 *82
 
 sideration of the application for a certificate of convenience and necessity the issue as to whether Congress had occupied the field was sharply drawn. The Supreme Court of the United States, which must he the final arbiter of the question as to whether the field has been occupied to the exclusion of state agencies, has not yet been called upon to determine the question. Approximately eight years have transpired since the enactment of the Transportation Act of 1920, and the commission is apparently far from having reached a solution of the problem. Public transportation is by far the most important factor in the economic life of the nation. Production would languish and distribution would perish if transportation failed to keep step with the forward march of civilization. Appliances, facilities, and equipment in rail transportation, as well as the methods employed, are subject to important changes from year to year. The passage of the Transportation Act of 1920 shows that Congress then realized the need of unified, co-ordinated service, and further, that the transportation companies were unable to meet the growing demands upon them. That act did not make immediately available the service of the Interstate Commerce Commission in acting upon applications for consolidation, but did make provision for applications for acquisitions of properties and for issuance of securities. The act further provided for a survey of the entire field and preparations of a tentative plan, and, after notice and hearings, a complete plan. Even after adoption of a complete plan, consolidations are not made compulsory, but applications may be made by two or more carriers by railroad to consolidate their prop
 
 *83
 
 erties into one corporation for ownership, management, and operation. Congress in so providing must have anticipated that which the event ha« demonstrated, viz., that it would be years before any complete plan would be adopted by the commission, and that the law itself would be the subject-matter of discussion and amendment. Important developments were inevitable, and an intensive study of the subject by the commission and the railway executives has resulted in much new light and has revealed the hidden difficulties in which the entire problem is involved.
 

 The basic inquiry in the instant case is whether it was the legislative intent to occupy the field of consolidation of railway properties to the exclusion of state governmental agencies, to such extent that the states could not consolidate two or more properties into a single corporate ownership until after the adoption of the complete plan, and approval by the commission. If the act of 1920 was merely the projection of a congressional vision authorizing a survey and research to determine transportation needs, then the field was not occupied by that enactment. If, on the other hand, it was the declaration of a definite, irrevocable policy to bring about a system of consolidations, even though much time would be necessarily consumed- in formulating the plan, there would be much logic in holding that it was the intent of Congress to occupy the field to the exclusion of state agencies.
 

 As was pointed out by Commissioner Eastman in 79 Interst. Com. Comm. R. 581, it is a familiar and forceful rule of construction of a statute that that which is necessarily implied is of no less force than
 
 *84
 
 that which is expressed, and it is manifest that it wonld be possible, during the period of years when the research was being prosecuted, .that combinations would be made which would completely frustrate the complete plans when adopted. At this very time, when this court is endeavoring to determine whether or not Congress has occupied the field, the committees on interstate commerce of both the House of Representatives and the Senate are having sessions and taking testimony, and it is apparent from the scope of the inquiry being conducted and the testimony offered and received that the entire situation is still embryonic. The discussion before the committees indicates that it has not yet been determined whether consolidations will be made compulsory or permissive. It further appears that a policy section is to be added to the act by amendment. True, this policy section, which is proposed to amend section 202 of the act, virtually declares that which the United States Supreme Court has already declared in a number of well-considered cases, viz.,
 
 New England Divisions Case,
 
 261 U. S., 184, 43 S. Ct., 270, 67 L. Ed., 605;
 
 Dayton Goose Greek Ry. Co.
 
 v.
 
 Uniled
 
 States, 263 U. S., 456, 44 S. Ct., 169, 68 L. Ed., 388, 33 A. L. R., 472.
 

 Whether or not Congress intended to occupy the field must necessarily be a question of policy, and inasmuch as the policy seems clearly not to have been fully determined it logically follows that the field has not been occupied to the exclusiQn of the states. Paragraph 2 of Section 5 of Title 49, U. S. Code, gives authority to the commission to approve and authorize acquisitions for control, .“not involving the consolidation” of carriers into a single
 
 *85
 
 system for ownership and operation. While this language, standing alone, might well be construed as impliedly prohibiting carriers from entering into any consolidation agreement, yet, when taken in connection with other paragraphs of that section, it must be construed as only prohibiting the commission from giving its approval to any consolidation prior to the adoption of a complete plan, but not as prohibiting the voluntary consolidation between carriers under state laws. Pending the adoption of the complete plan, voluntary consolidations not violative of state or federal anti-trust laws are not expressly prohibited. If, on adoption of a complete plan, it should be found that any consolidation made by voluntary agreement is out of harmony with such plan, the consolidated corporation might find itself in an unfortunate situation, but we are not concerned with that question at this time. In the case at bar the consolidation is in harmony with the tentative plan and the commission has declared that it will “serve the public interest in an exceptional degree. ’ ’ The commission has not, however, officially committed itself beyond issuance of a certificate of public convenience and issuance of securities.
 

 It is significant that certain portions of the Transportation Act of 1920 (Title 49, Section 1
 
 et seq.,
 
 U. S. Code), are prohibitive and penal in their nature, viz., the ones relating to the certificate of public convenience and necessity and authority to issue securities, and that other portions of the act declare certain things to be lawful. Nowhere in the statute is it declared that consolidations are compulsory, and the present inquiries before the committee of, Congress relate to the question whether it shall be
 
 *86
 
 the policy to make consolidations compulsory. If paragraph 6 of Section 5 of Title 49, U. S. Code, declaring consolidations to be lawful after certain preliminary steps have been taken and the approval of the commission given, had been followed by a further provision that consolidations were to be eventually compulsory, in accordance with the complete plan to be thereafter adopted, we would entertain no doubt that it was the intent of Congress to occupy the field to the exclusion of state agencies. On the other hand, in view of the long lapse of time and the small progress made and the present research and investigation inside and outside of the committees of Congress, which will inevitably lead to many more years of interim before any complete plan will be adopted, and in view of a possibility that the entire plan of unification will ultimately fail, we think the doubt should be resolved in favor of the validity of the consolidation in the instant case. This is, of course, subject to any changes which might become necessary to conform to the complete plan when adopted.
 

 Numerous decisions of the federal Supreme Court have been cited and discussed by counsel, but they deal with a variety of situations and interpret a great variety of statutes. In determining whether a given piece of legislation is intended to occupy the field, each case is
 
 sui
 
 generis, and this fact was virtually declared in
 
 Pa. Rd. Co.
 
 v.
 
 Public Service Comm, of Pa.,
 
 250 U. S., 566, 40 S. Ct., 36, 63 L. Ed., 1142. Rules have been promulgated in certain decisions, but, as stated in
 
 Shafer
 
 v.
 
 Farmers’ Grain
 
 Co., 268 U. S., 189, 45 S. Ct., 481, 69 L. Ed., 909, they are difficult of application by reason of the existence
 
 *87
 
 of statutes closely approaching the line which separates one rule from another, and, as was further stated, the decisions dealing with exceptional situations have not been in full accord.
 

 In
 
 New York Central Rd. Co.
 
 v.
 
 Winfield,
 
 244 U. S., 147, 154, 37 S. Ct., 546, 61 L. Ed., 1045, L. R. A., 1918C, 439, Ann. Cas., 1917D, 1139, Mr. Justice Brandéis formulated a series of rules in determining when a federal statute regulating commerce will be held to supersede state legislation in the exercise of the police power, but none of these rules are pertinent to the instant case. The cases which are found most helpful to the instant controversy are those which have declared that the intent of Congress to supersede the exercise of the police power by the states will not be inferred unless the act of Congress, fairly interpreted, is in actual conflict with the state law. This was expressly stated in
 
 Savage
 
 v.
 
 Jones, State Chemist,
 
 225 U. S., 501, 32 S. Ct., 715, 56 L. Ed., 1182, in deciding the conflict between the Pood and Drug Act of Indiana (Acts, 1907, c. 206) and the Federal Food and Drug Act of 1906 (Title 21, Section 1
 
 et seq.,
 
 U. S. Code). In
 
 Southern Ry. Co.
 
 v.
 
 Railroad Comm. of Indiana,
 
 236 U. S., 439, 35 S. Ct., 304, 59 L. Ed., 661, it was decided that Congress might occupy only a limited field, leaving the subject partly open to incidental legislation by the states.. In
 
 Atlantic Coast Line Rd. Co.
 
 v.
 
 Georgia,
 
 234 U. S., 280, 34 S. Ct., 829, 68 L. Ed., 1312, it was decided that locomotive headlights could be regulated by state authorities because the Safety Appliance Act did not at that time regulate that subject. And this principle was emphasized in the later case of
 
 Napier v. Atl. Coast Line Rd. Co.,
 
 272 U. S., 605, 47 S. Ct.,
 
 *88
 
 207, 71 L. Ed., 432, decided November 20,192$, where it was decided that all parts of a locomotive were removed from state regulation, because the act of 1915 extended the provisions of the act to “include the entire locomotive and tender and all parts and appurtenances thereof.” The Hours of Service law of March 4, 1907 (Title 45, Sections 61 to 64, U. S. Code; U. S. Comp. Stats., Sections 8677 to 8680), was under consideration in
 
 Northern Pac. Ry. Co.
 
 v.
 
 Washington ex rel. Atkinson, Atty. Gen.,
 
 222 U. S., 370, 32 S. Ct., 160, 56 L. Ed., 237, and it was held, that, although that act did not go into effect for a year after its passage, Congress must be held to have intended to occupy the entire field, because of the necessity of changing division points, entailing removal of employees, and other readjustments requiring the intervening time. These and other cases clearly show that every act of Congress must be interpreted in the light of the purposes to be served, the relation to the public welfare, and the particular language employed in the act itself. In the light of all those cases, we find nothing in the Transportation Act of 1920 prohibiting consolidations under state statutes, where no anti-trust legislation is violated, during the interim of formulation and adoption of a complete plan of unification. It seems more reasonable to hold that Congress has merely surveyed the field without fully occupying it, and that section 5 of the Interstate Commerce Act, as amended, operates as a caveat and a warning, but not as an injunction.
 

 Since the vital 'question in this case relates to the validity of the corporation, that subject requires further comment. ’It is not doubted that Congress
 
 *89
 
 has the power either by special act or general laws to grant corporate franchises to interstate carriers. This authority has many times been exercised by special acts, but never by general laws. The matter of corporate instrumentality, except in special cases, has been left to state agencies. The Transportation Act of 1920 did not provide for corporate forms. That subject was under discussion and definitely rejected. Whatever differences of opinion may exist, and however plausible the arguments pro and con, the fact is that after eight years of effort little progress has been made toward unification by the commission, and very considerable progress made by the voluntary action of the carriers. This voluntary action has been favored and aided by the commission, under authority of the administrative provisions of Sections 1 and 20a, Title 49, IT. S. Code, and enormous losses would now be incurred if the acquisition of property and issues of securities should be required to be “unscrambled.” The commission has followed a definite and consistent course of interpretation for eight years, and the carriers have gone forward in reliance upon that course. The uniform procedure of the commission, whether with or without clear authority, should not lightly be overthrown by a’ state tribunal.
 

 The commission has undisputed power under the act to grant certificates of public convenience afid to authorize the issuance of securities. That authority has been freely exercised, and it would become a source of infinite detriment and damage if a state corporation relying upon it finds all its acts illegal in the absence of approval of the consolidation. The clear power to grant the preliminary
 
 *90
 
 authority implies that the corporate instrumentality by which the grant is executed will have its legal existence recognized. These considerations furnish the most cogent reasons for reaching the conclusion that pending the approval of a complete plan of unification Congress did not intend to occupy the field to the exclusion of the laws of the states.
 

 The judgment of the Court of Appeals must be affirmed.
 

 Judgment affirmed.
 

 Day, Allen, Kinkade and Robinson, JJ., concur.
 

 J ones, J., concurs in the judgment.
 

 Matthias, J., not participating.