# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 29, 2006

126121

NATIONAL WINE & SPIRITS, INC.,
NWS MICHIGAN, INC., and
NATIONAL WINE & SPIRITS, L.L.C.,
        Plaintiffs-Appellants,

v

STATE OF MICHIGAN,
        Defendant-Appellee,
and

MICHIGAN BEER & WINE
WHOLESALERS ASSOCIATION,
        Intervening Defendant-Appellee.

_____/

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

SC: 126121
COA: 243524
Ingham CC: 02-000013-CZ

On order of the Court, leave to appeal having been granted and the case having been briefed and argued by counsel, the order of January 20, 2006 which granted leave to appeal is VACATED and leave to appeal is DENIED because we are no longer persuaded the questions presented should be reviewed by this Court.

CAVANAGH, J., dissents and states as follows:

I respectfully disagree with the majority's determination that leave to appeal was improvidently granted in this case. The issues are jurisprudentially significant and far-reaching. I further note that this Court heard oral argument on the application and then chose to issue an order granting leave to appeal and requiring full briefing and oral argument. After considering arguments on the issues *twice*, I believe that this Court should issue an opinion on the merits of the issues presented.

KELLY, J., joins the statement of CAVANAGH, J.

WEAVER, J., dissents and states as follows:

I dissent from the majority's decision that leave to appeal was improvidently granted. I would remand this case to the Court of Appeals for reconsideration in light of *Granholm v Heald*, 544 US 460 (2005).

The statute at issue, MCL 436.1205(3),[1] while perhaps not unconstitutional on its face, as applied, forever prohibits an out-of-state business from operating as both an authorized distribution agent of spirits and as a distributor of wine. Michigan distributors of wine in operation before September 24, 1996, on the other hand, were permitted to also become authorized distribution agents of spirits (ADAs). As a result, § 205(3) precludes out-of-state distributors from achieving the benefits of a combined cost economy.[2]

In addition, § 205(3) prohibits any distributors established after September 24, 1996, from selling or distributing a brand of wine in an area where an established distributor has already been assigned or authorized to sell that particular brand of wine.[3]

---

[1] Section 205(3), in pertinent part, is set forth below:

> After September 24, 1996, an authorized distribution agent or an applicant to become an authorized distribution agent who directly or indirectly becomes licensed subsequently as a wholesaler shall not be appointed to sell a brand of wine in a county or part of a county for which a wholesaler has been appointed to sell that brand under an agreement required by this act. A wholesaler who directly or indirectly becomes an authorized distribution agent shall not sell or be appointed to sell a brand of wine to a retailer in a county or part of a county for which another wholesaler has been appointed to sell that brand under an agreement required by this act, unless that wholesaler was appointed to sell and was actively selling that brand to retailers in that county or part of that county prior to September 24, 1996, or unless the sale and appointment is the result of an acquisition, purchase, or merger with the existing wholesaler who was selling that brand to a retailer in that county or part of that county prior to September 24, 1996.

[2] For example, when a Michigan distributor operating as both an ADA of spirits and as a wine distributor delivers spirits and wine to retailers on the same truck, it can lower its delivery costs. However, under § 205(3), out-of-state distributors cannot conserve costs by loading wine and spirits on the same truck.

[3] Before September 24, 1996, Michigan wine distributors were not prohibited from "dualing," a concept whereby a wine distributor could compete with other distributors in a particular area and sell the same competing brands of wine. After September 24, 1996, only those wine distributors established in Michigan before that date could continue "dualing."

Thus, those Michigan distributors established before 1996 enjoy the competitive advantage of being able to sell certain brands exclusively, and to also act as authorized distribution agents of both spirits and wine.

It is undisputed that before September 24, 1996, only Michigan businesses were licensed as wine wholesalers in the State of Michigan. Consequently, when § 205(3) was enacted, only existing Michigan wine distributors retained the benefit of distributing all the wine brands they sold as before September 24, 1996. Conversely, no out-of-state wine distributor could achieve the same benefit, nor could any out-of-state distributor ever enjoy the cost savings of becoming a distributor of both wine and spirits.

The United States Supreme Court's decision in *Granholm* had not been released at the time the Court of Appeals decided this case. Had the Court of Appeals had the benefit of the United States Supreme Court's ruling in *Granholm*, it may very well have concluded that the burden on interstate commerce imposed by § 205(3) outweighs the state's objective in preserving the existing three-tier alcohol distribution system.[4] As the United States Supreme Court noted in *Granholm*, protectionist state legislation that

---

[4] The traditional Commerce Clause test was discussed by the United States Supreme Court in *Brown-Forman Distillers Corp v New York State Liquor Auth,* 476 US 573, 578-579 (1986):

> This Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. See, *e. g., Philadelphia v. New Jersey*, 437 U.S. 617, 98 S. Ct. 2531, 57 L. Ed. 2d 475 (1978); *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 45 S. Ct. 481, 69 L.Ed. 909 (1925); *Edgar* v. *MITE Corp.*, 457 U.S. 624, 640-643, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity. See *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440-441, 98 S. Ct. 787, 54 L. Ed. 2d 664 (1978).

provides a competitive advantage to intrastate commerce is subject to attack under the Commerce Clause:

> Time and again this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore., 511 U.S. 93, 99, 114 S. Ct. 1345, 128 L. Ed. 2d 13 (1994). See also New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 274, 108 S. Ct. 1803, 100 L. Ed. 2d 302 (1988). This rule is essential to the foundations of the Union. The mere fact of nonresidence should not foreclose a producer in one State from access to markets in other States. H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 539, 69 S. Ct. 657, 93 L. Ed. 865 (1949). States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses. This mandate "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-326, 99 S. Ct. 1727, 60 L. Ed. 2d 250 (1979). [*Granholm* at 472.]

Given the constitutional implications posed by the application of § 205(3), and given the United States Supreme Court's mandate against differential treatment of out-of-state economic interests, a remand to the Court of Appeals for reconsideration in light of *Granholm* would be the most judicious resolution of this case.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 29, 2006

Clerk

s1121