## NEW YORK, CHICAGO & ST. LOUIS RAILROAD CO. *v.* FRANK.

No. 15.  Reargued October 16, 17, 1941.—Decided December 8, 1941.

---

*Mr. William J. Donovan,* with whom *Messrs. John H. Agate, Ralstone R. Irvine,* and *Theodore S. Hope, Jr.* were on the brief for appellant.

*Mr. Louis J. Vorhaus,* with whom *Messrs. David Vorhaus* and *Joseph Fischer* were on the brief, for appellee.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The appellant, commonly known as the Nickel Plate Road, was organized in 1923 as a consolidated corporation under the laws of five states: New York, Pennsylvania, Ohio, Indiana, and Illinois. The agreements and articles of consolidation provided that it should succeed to all of the properties and franchises, contracts, and obligations owned by its constituent companies. Section 143 of the New York Railroad Law, under which the new corporation came into being, provided that "all debts and liabili-

ties incurred by either of such corporations shall thenceforth attach to such new corporation, and be enforced against it and its property to the same extent as if incurred or contracted by it." [1] Among the constituent companies was the Lake Erie & Western Railroad. In connection with a lease of certain properties from the Northern Ohio Railway it had guaranteed payment of principal and interest upon the latter's bonds secured by mortgage on the leased property. Because of the contention that the state law "attached" the obligations of this guaranty to the Nickel Plate, it has now been held liable upon defaulted coupons by a Municipal Court of the City of New York.

The appellant defended on two grounds: *First,* that the original guaranty by the Lake Erie was *ultra vires.* This defense was overruled by the state court and nothing of that issue survives for our consideration. *Second,* that approval by the Interstate Commerce Commission was necessary under § 20a of the Interstate Commerce Act before appellant legally could "assume" the obligation,[2]

---

[1] The complete text of § 143 of the New York Railroad Law was as follows:

"The rights of all creditors of, and all liens upon the property of, either of such corporations, parties to such agreement and act, shall be preserved unimpaired, and the respective corporations shall be deemed to continue in existence to preserve the same, and all debts and liabilities incurred by either of such corporations shall thenceforth attach to such new corporation, and be enforced against it and its property to the same extent as if incurred or contracted by it. No actions or proceedings in which either of such corporations is a party shall abate or be discontinued by such agreement and act of consolidation, but may be conducted to final judgment in the names of such corporations, or such new corporation may be, by order of the court, on motion substituted as a party."

[2] § 20a (2) of the Interstate Commerce Act provided that:

"It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness

and that such approval had not been given. This defense, too, was overruled by the state court, and this federal question comes here by appeal.

In support of this defense the appellant set forth a letter, dated November 25, 1939, from the Secretary of the Interstate Commerce Commission, which advised "that the New York, Chicago & St. Louis Railroad Company has never applied for, nor received authorization pursuant to section 20 (a) of the Interstate Commerce Act to assume any obligation or liability as lessor, lessee, guarantor, endorser, surety, or otherwise in respect of bonds of the Northern Ohio Railway Company." But it added that "for further information I would refer" to a reported case in which the Commission had said: "That the consolidation had the effect of transferring the guaranty of the Lake Erie to the Nickel Plate appears to be generally assumed by the parties to the reorganization proceeding . . ." [3]

of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption. The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

[3] Akron, C. & Y. Ry. Co. & Northern O. Ry. Co. Reorganization, 236 I. C. C. 214, 216–217.

Compare the following, from a letter written by the Director of the Commission to one Zinman, dated March 19, 1940, referring to

This reference suggests an examination of the administrative history of the Nickel Plate consolidation and financing to learn what administrative application has been made of the statutes in question to the debt structure of this particular appellant.

Shortly after its consolidation the appellant asked the Interstate Commerce Commission to certify under § 1 of the Interstate Commerce Act that public convenience and necessity required the acquisition and operation by it of the railroad lines owned by the constituent companies. It also asked authority under § 20a to issue preferred and common capital stocks in the amounts fixed by the agreements and articles of consolidation. It did not, however, ask under § 5 of the Act for approval of its consolidation. Acquisition and Stock Issue by N. Y., C. & St. L. R. Co., 79 I. C. C. 581.

This application required the Commission to construe the Transportation Act of 1920, which had recently introduced a wide range of innovations into the Interstate Commerce Act. Section 5 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, directed the Commission to formulate "as soon as practicable" a complete plan for the consolidation of the railways into a limited number of systems. As so amended, § 5 also subjected voluntary consolidations to the ap-

---

the Nickel Plate Guaranty on the Northern Ohio bonds, and appearing in the Commission's file in Acquisition and Stock Issue by N. Y., C. & St. L. R. Co., 79 I. C. C. 581:

· "As to the matter of assumption of obligation and liability in respect of the securities of others, it is our understanding that no authority was sought nor granted in connection with the application recorded under the above Finance Docket number. It is our further understanding that the consolidated company took the properties, rights, and franchises of the constituent companies, subject to all their debts, obligations, and liabilities, such as might be imposed by the consolidation statutes of the states of the constituent companies. See 82 I. C. C. 365 (366)."

proval of the Commission and required that they be approved if found, among other things, to be in harmony with such complete plan for general consolidation and if it appeared that the bonds of the consolidated corporations at par together with the outstanding capital stock at par would not exceed the value of the consolidated properties as determined by the Commission. By adding § 20a, the Transportation Act placed the issue of new securities and the assumption of obligations under the control of the Commission. The Act did not, however, provide for federal incorporation or for federal consolidation of carriers, but left the creation of new or consolidated corporations to state laws.

At the time of the Nickel Plate's application for approval of its acquisition and operation of properties and the issue of its stock, the Commission had not completed its valuation of the constituent companies nor adopted a complete plan of consolidation. The question arose, therefore, whether under the peculiarities of the statute the Commission was yet authorized to exercise any control over voluntary consolidations and the legal incidents and consequences thereof. On this question the Commission was divided in opinion. Commissioner Eastman, supported by Commissioners Esch and Hall, thought the amendment to § 5 of the Interstate Commerce Act should be construed as being immediately effective to make any consolidation not approved by the Commission unlawful. Had such a view prevailed, the terms of the Nickel Plate consolidation would have been subject to scrutiny at that time. Each item of its debt would have been examined and approved or rejected, and its capital structure, including stock issue as well as debts, would have been tested by the valuation of its properties. The majority opinion, however, held that the Commission's approval under § 5 was unnecessary. It stated: "Applicable State laws afford means to effect the consolidation. Such laws

are in force. They are, in fact, the laws to which resort must be had to effectuate consolidations which the interstate commerce act is designed to facilitate. We can not conclude that they have been nullified or superseded. As valid existing laws we have no power to suspend them. Whether State corporations in matters regarding their status as legal entities as distinguished from their participation in interstate commerce may avail themselves of such laws does not depend upon our election or anything we do. Authority in us to withhold approval in the public interest of security issues when State laws permit consolidation does not mean that we may not grant approval when public interest requires that we do so. Furthermore, in the absence of mandatory provisions of a Federal statute we should give full faith and credit to the acts of sovereign States, especially when, as in this case, their action is unanimous." 79 I. C. C. at pp. 585–586. The majority opinion added that the Act did not provide for "compulsory consolidation," that such a provision had been "considered by the Congress and rejected," and that accordingly "it does not seem we should conclude that the Congress intended to prevent voluntary consolidations under available State laws in order thereby to force consolidation under such general plan as we may ultimately adopt." *Id.*, p. 586. It said that "if the Congress had intended to suspend State laws until we should at some later time elect to permit their use, such intent would have been manifested in plain terms." *Ibid.* The majority of the Commission concluded that by virtue of the state proceedings and notwithstanding the lack of approval by the Interstate Commerce Commission "all things necessary to the completion and consummation of the consolidation have been effected." 79 I. C. C. at p. 583.

The Commission thereupon entered an order giving appellant its formal approval to the issue of new stock, including that to be exchanged share for share for upwards

of $23,000,000 par value of the shares in the old Lake Erie Company, subject to an agreement to contribute a relatively small part of it to the treasury of the new company, all as provided in the agreements and articles of consolidation.

The Commission did not, in authorizing this stock issue, make any finding that such stock at par together with bonds at par did not exceed the value of the consolidated properties. It made no order approving assumption of any indebtedness of any kind. It appears that the appellant at that time sought no such authority. Approaching maturity of some issues of bonds eventually forced it to take some corporate action, and upon such later occasions it sought and obtained authorization to extend maturity dates and in connection with such extensions to make an express assumption of liability as *primary* obligor.

One of the constituent companies—the old Nickel Plate—had outstanding at consolidation $16,381,000 of a bond issue dated October 1, 1887, maturing October 1, 1937. The assumption of this obligation was not approved until September 17, 1937, at which time the Commission approved a proposal to extend the maturity date for ten years and to assume obligation as primary obligor in respect of the extended bonds. N. Y., C. & St. L. R. Co. Bonds and Assumption, 221 I. C. C. 772. The published reports of the Commission disclose two instances of similar approval of extension and assumption of primary liability with respect to bonds of the Lake Erie & Western outstanding at the date of consolidation, one as recent as June 7, 1941. N. Y., C. & St. L. R. Co. Assumption of Obligation, 217 I. C. C. 598; N. Y., C. & St. L. R. Co. Assumption of Obligation, 247 I. C. C. 71.

It does not appear that either the Nickel Plate or the Commission questioned the Nickel Plate's obligation to pay either interest or principal of the debts of the con-

stituent companies, although for long periods after the consolidation they were without the Commission's approval. Instead, the Commission has indicated that it regarded the state law as adequate to attach liability to the new company for such debts. In 1923, shortly after the consolidation, the Nickel Plate applied under § 20a of the Interstate Commerce Act to endorse its guaranty of payment upon certain bonds to be issued by a constituent company, and the premise upon which relief was granted was stated by the Commission: "It appears that the consolidation was completed on April 11, 1923, and that the new company is now vested with the property, rights, and franchises of the Nickel Plate and other constituent companies, *subject to all their debts, obligations, and liabilities.*" (Italics supplied.) N. Y., C. & St. L. R. R. Bonds, 82 I. C. C. 365, 366. The following year, in dealing with another constituent company, the Commission defined the status of this appellant as follows: "The applicant is the successor, by consolidation, of the Toledo, St. Louis & Western Railroad Company and other companies, and *by virtue of such consolidation* has acquired all property, rights, and powers, *and has assumed all obligations* of the Toledo, St. Louis & Western Railroad Company." (Italics supplied.) Pledge of Bonds by N. Y., C. & St. L. R. R., 86 I. C. C. 465.

The Commission, as well as appellant, as recently as 1938 gave unmistakable recognition to the validity of the guaranty on which appellee has recovered. This appears from the reorganization proceedings under § 77 of the Bankruptcy Act involving the properties of the Northern Ohio, the original obligor whose payments were guaranteed by appellant's constituent company, the Lake Erie & Western. The Commission stated that: *"From the consolidation* of the Lake Erie & Western with the New York, Chicago & St. Louis, *resulting liability* of the latter on the Lake Erie's guaranty of the Northern's bonds *thus is ap-*

*parently admitted.*" (Italics supplied.)[4] Upon that premise the Commission made allowance in the plan of reorganization for the indemnification of the appellant because, if required to make good on the guaranty, it would become subrogated to the rights of the Northern Ohio bondholders as a mortgage creditor and would become a general creditor in the amount of any deficiency.

---

[4] Akron, C. & Y. Ry. Co. and Northern O. Ry. Co. Reorganization, 228 I. C. C. 645, 647.

The plan approved by the Commission provided:

"Appropriate securities of the new company as hereinafter noted, consistent with the other provisions of the plan, with which to recompense the New York, Chicago and St. Louis Railroad Company for the debtor's and the intervening debtor's liability to it for amounts expended in the performance of its guaranty of the first-mortgage bonds of the intervening debtor, shall be issued and held in treasury." *Id.*, pp. 679–680. Also, "The New York, Chicago & St. Louis Railroad Company, upon presentation to the treasurer of the new company of appropriate proof of loss sustained in the performance of its contract of guaranty of bonds of the intervening debtor, shall receive of the new company stock issued in reorganization and held in treasury, for each $100 of loss so proved, $22.79, par value, of new common stock; and shall participate equally and ratably with the holders of class A warrants in any distribution of stock pursuant thereto, each $100 of proved loss entitling the New York, Chicago & St. Louis Railroad Company to participate in the distribution to the same extent as one class A warrant." *Id.*, pp. 681–682.

The true inwardness of these provisions of the reorganization plan appears from the opinion:

"The New York, Chicago & St. Louis should be treated as though having a claim equal to the losses it will sustain in the performance of its guaranty. The mathematical maximum of this claim would be equal to the principal of the outstanding Northern bonds plus the four years of overdue interest thereon, or $3,000,000. The probable maximum would be very much less, but cannot be determined on any definite basis. Securities should accordingly be reserved pending performance of the New York, Chicago & St. Louis guaranty on the basis of its having a $3,000,000 claim." *Id.*, p. 673.

The securities, however, thus set aside to the Nickel Plate were to come back to others "as may be made possible through the New York,

We draw the following conclusions from this history of the Nickel Plate's experience before the Interstate Commerce Commission:

By its decision in Acquisition and Stock Issue by N. Y., C. & St. L. R. Co., 79 I. C. C. 581, the Commission adopted the construction of the Transportation Act which the Nickel Plate urged upon it and held itself precluded from supervision of the consolidation under § 5. This Court subsequently approved that construction in *Snyder* v. *N. Y., C. & St. L. R. Co.*, 118 Ohio St. 72, 160 N. E. 615, 278 U. S. 578, holding that the Nickel Plate had the rights of a *de jure* corporation notwithstanding its failure to have its creation by consolidation approved by the Commission, on the ground that the consolidation took place at a time when § 5 had "not as yet become applicable."

It seems clear that the Commission applied a like construction of its powers under § 20a over the assumption of the debts and liabilities of the constituent companies. That it deliberately deferred to a later day consideration of all debts seems the correct inference from its express

---

Chicago & St. Louis settling with the Northern bondholders, or otherwise discharging its liabilities, for less than the maximum. . . ." *Id.*, pp. 673–674.

An effort was apparently made to get rid of this obligation, in part at least, in the reorganization; but the Commission held that this guaranty ran to each Northern bondholder individually, and that the Nickel Plate could not deal with the bondholders as a class, on the ground that there appeared to be no provision in § 77 "for enforcing on all in lieu of the guaranty a compromise that may be agreeable to a majority but not acceptable to a minority, and no provision for discharging in these proceedings the New York, Chicago & St. Louis, a solvent obligor able to meet its debts as they mature, from any of its obligations. It follows that a provision in a plan of reorganization of the debtors, pursuant to section 77, releasing the guaranty, would be of such doubtful validity as to require our disapproval, and that settlements for this guaranty should be made separately from the plan of reorganization. . . ." *Id.*, p. 667.

*caveat* that "Nothing in this report shall be construed as restricting the commission in its action with respect to the promulgation of a complete consolidation plan or upon the subject of valuation." 79 I. C. C. at p. 585. Even apart from this *caveat*, it is clear that the Commission's failure at this time to make either order or investigation with reference to any debts or liabilities was due to no delusion that the Nickel Plate was being launched as a debt-free railroad. It was a matter of common knowledge that the constituent companies were heavily in debt for which no provision had been made other than by attachment to the new corporation under state law. This and the resulting burden of fixed charges on the revenues of the new company were well known to the Commission.[5] The disappearance of all debt from consideration by the Commission cannot be accounted for except on the ground that the Commission held itself without jurisdiction to deal with it until the company should propose some action of its own, such as extension, endorsement, or issue of sub-

---

[5] The application of the Nickel Plate asked authority to issue 327,200 shares of preferred stock and 462,479 shares of common stock to be exchanged share for share for the stocks of the constituent companies. It included a general balance sheet of each constituent company and a consolidated balance sheet showing long-term debts of the constituent companies aggregating $78,897,000, which items and exact amounts were carried into the consolidated balance sheet.

The Lake Erie & Western Railroad Company was shown to have outstanding capital stocks with a par value of $23,680,000, $13,895,600 of long-term debt, and $4,996,944 of "deferred liabilities." The stock was replaced with a like amount of stock in the new company, and the debt and "deferred liabilities" were carried in full into the consolidated balance sheet under the same headings. The obligation in suit was not specified; perhaps it was included in "deferred liabilities."

A Stockholders' Protective Committee of the old Nickel Plate filed objections to the plan of consolidation, one of the grounds of which was the alleged assumption of a heavy bond indebtedness ahead of the stock, and complaint was specifically made of the indebtedness of the Lake Erie & Western.

stitute securities—as distinguished from the effect of the law of consolidation on the fact of pre-existing debts. That such was the holding is further indicated by the Commission's subsequent handling of the obligations of the constituent companies.

Whether we would agree with the Commission's interpretation of the Act as an original matter, it is not necessary to decide. Considerations of public interest certainly should have weighed heavily in favor of the Commission, had it asserted power to review the debts of the new company before giving even tentative and formal approval to capitalization of its equity. What we must now decide is the present effect of the Commission's interpretation of its powers as to the indebtedness of this particular appellant, woven, as it has been, by a series of actions by the Commission, into the whole financial fabric of this important carrier system. We are now asked blindly to unravel we know not what, by reversing a consistent and long-standing interpretation of § 20a by the administrative body to which its enforcement was committed.[6] We are asked to do this to the enrichment of a stockholder equity which itself was capitalized with no thorough scrutiny by virtue of the same interpretation. We are asked to do this

---

[6] This interpretation is not inconsistent with the Commission's practice in other cases. Assumption of Obligation by Hudson River Connecting R. R., 72 I. C. C. 595, dealt with assumption of liability on a mortgage which the applicant had agreed to assume as part of the purchase price of a piece of land. It had no connection with any consolidation proceeding. Rock Island System Consolidation, 193 I. C. C. 395, was decided after amendment of § 5 by the Emergency Railroad Transportation Act approved June 16, 1933. The Commission had by the time of that decision promulgated a plan of consolidation, and it found that the Rock Island consolidation would be "in harmony with and in furtherance of the plan." *Id.*, p. 403. It was the absence of such a plan that defeated jurisdiction of the Commission to approve the Nickel Plate consolidation. *Snyder* v. *N. Y., C. & St. L. R. Co., supra.*

although the Commission, with knowledge of the claim of illegality, has set aside securities in the Akron reorganization to compensate it in some measure and has made no effort to enjoin the Nickel Plate from using its revenues to satisfy, in part at least, the claims of these bondholders.

Under the circumstances of this case, the administrative interpretation on which the Commission has acted in its long course of dealing with Nickel Plate affairs should not be upset. *United States* v. *Chicago North Shore R. Co.*, 288 U. S. 1.

The judgment appealed from is

*Affirmed.*

MR. JUSTICE DOUGLAS:

While I agree with the opinion of the Court, I think an elaboration of the point, which is the nub of the case, is desirable in view of certain observations in the dissenting opinion.

Appellant is a corporation formed under § 141 of New York Railroad Law, which provides for consolidation of railroad corporations. On the filing of the articles or agreement of consolidation, the several constituent companies "shall be one corporation by the name provided in such agreement." And § 141 also provides that "such act of consolidation shall not release such new corporation from any of the restrictions, liabilities or duties of the several corporations so consolidated." By § 143 all debts of the constituent companies "shall thenceforth attach to such new corporation, and be enforced against it and its property to the same extent as if incurred or contracted by it." We are pointed to no provision of the New York law which would permit the creation of the new consolidated corporation without the attachment of the debts of the constituent companies.

*Snyder* v. *New York, C. & St. L. R. Co.*, 118 Oh. St. 72, 160 N. E. 615, aff'd 278 U. S. 578, held that authority from

the Commission was not necessary to create this consolidated corporation. A necessary and inherent incident of its creation was the attachment of these obligations. Hence, I do not see how we can say that, although authority from the Commission was not necessary to create appellant, such authority was necessary in order for this consolidated corporation to meet the requirements which the New York law exacted as conditions to its creation. But if we held that an attachment of liability under the New York Consolidation Act was an "assumption" of liability within the meaning of § 20 (a), we would be doing just that. Hence, I feel forced to conclude that, in case of this type of consolidation, "assumption" in § 20 (a) does not include attachment of liability by virtue of the filing of articles of consolidation under a state statute, though it would, of course, include the issuance of any security or the incurrence or extension of any obligation subsequent to consolidation. Such is one consequence of the failure to follow Commissioner Eastman's views in Acquisition and Stock Issue of N. Y., C. & St. L. R. Co., 79 I. C. C. 581. But I do not see how, in all fairness, we can reopen at this late stage the unfortunate decision in the *Snyder* case.

MR. CHIEF JUSTICE STONE:

I think the judgment should be reversed, but without prejudice to any right of appellee to recover under § 20 (a) (11) of the Interstate Commerce Act.

I am not now prepared to say that appellee could not have recovered under the provisions of § 20 (a) (11) had counsel seen fit to present the question for decision.[1] But

---

[1] 49 U. S. C. § 20 (a) (11), after providing that assumptions of obligations not approved by the Commission are void, declares:

"If . . . any security in respect to which the assumption of obligation or liability is so made void, is acquired by any person for value and in good faith and without notice that the . . . assumption is void, such person may in a suit or action in any court of competent jurisdiction,

the only question which they have briefed and argued here is whether § 20 (a) (2) precludes the imposition of the asserted liability upon appellant where, as is the case here, its assumption by appellant has not been approved by order of the Commission as required by that section. The Court avoids decision of this question by declaring that the Commission has declined to give its approval because it has construed § 20 (a) (2) as inapplicable and that we are bound by that construction.

Examination of the Commission's opinions and orders from which the Court draws its cryptic answer to the question before us makes it plain that the Commission has placed no such construction on the statute in any case, and that, in the cases cited relating to the Nickel Plate consolidation, it has never had any occasion to construe § 20 (a) (2). On the contrary, in several cases, the Commission has construed § 20 (a) (2) as applicable to obligations like the present, which "attach" by operation of state law to the acquisition by the carrier of the property of other roads, and in conformity to that section has approved the "assumption" of such liability by the carrier.

In the cases before the Commission on which the Court relies, it appears that the Commission was not asked to pass upon the question now before us and did not purport to pass upon it. The opinion of the Court thus rests on no more substantial basis than the circumstance that the Commission has acted favorably on an application of ap-

---

hold jointly and severally liable for the full amount of the damage sustained by him in respect thereof, the carrier which . . . assumed the obligation or liability so made void, and its directors, officers, attorneys, and other agents, who participated in any way . . . in the authorizing of the assumption of the obligation or liability so made void."

It appears from the record, in an affidavit upon which summary judgment was granted, that in 1936, after the consolidation, appellee purchased the bonds from a broker for value "without notice of any defense thereto or to the guarantee thereof."

pellant to be permitted to operate the consolidated lines and to issue securities in conformity to the plan of consolidation, in a proceeding in which the Commission was neither asked to take, nor took, any action with respect to assumption of liabilities; and this under a statutory scheme of control which plainly contemplates that a consolidation may go into effect without adoption of its assumption of liability feature, which in any case can become operative only by order of the Commission approving it upon application and on findings that the public interest will be served. Rock Island System Consolidation, 193 I. C. C. 395, 403–04; Acquisition and Stock Issue by P., O. & D. R. R., 105 I. C. C. 189, 193. The Court infers the Commission's refusal to approve the assumption of liability for want of jurisdiction from the silence and inaction of the Commission when it was not called upon to speak or to act, either by the statute or by any application pending before it.

Section 20 (a) (2) of the Interstate Commerce Act contains two prohibitions. One is imposed on the issuance of securities by railroads without approval of the Commission. The other makes it unlawful for such a carrier to assume any obligation in respect of securities issued by others, "even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of . . . the proposed assumption of obligation . . . the Commission by order authorizes such issue or assumption." The statute commands with particularity that "The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair

its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

It will be noted that there is no requirement of the statute that applications for the acquisition of other roads or for the approval of security issues, and applications for approval of the assumption of guarantee obligations, shall be united in a single proceeding. Indeed, it is clear that the statute leaves the Commission free to approve the one and reject an application for the other. And it appears that the uniform practice of the Commission has been, as the statute directs, to entertain neither, except on an application asking the desired approval. And where more than one is asked, the Commission has by its order separately dealt with those upon which it intended to act. E. g., Acquisition of C. & O. Northern Ry. Co. by C. & O. Ry., 70 I. C. C. 550; Gainesville Midland Reorganization, 131 I. C. C. 355; Control of Greenbrier, Cheat & Elk R. R., 131 I. C. C. 525; Chicago, M., St. P. & P. R. Co. Acquisition, 158 I. C. C. 770; Elmira & L. O. R. Co. Acquisition, 170 I. C. C. 127.

The Commission has pointed out that its action in passing on applications under each of the paragraphs 18 to 20 inclusive, of § 1, or under § 5 (2), of the Act, is limited to the particular provision of the Act on which the application is founded, and is not to be construed as a decision on any other provision. See Acquisition of Line by O. C. S. I. Ry., 86 I. C. C. 273, 274; Acquisition by A., T. & S. F. Ry., 138 I. C. C. 787, 789; Acquisition by St. L.-S. F. Ry., 145 I. C. C. 110, 114; Chicago, M. & St. P. Reorganization, 131 I. C. C. 673, 691–92; New York Central R. Co. Assumption, 158 I. C. C. 317, 320–23; Pacific Coast R. Co. Acquisition, 187 I. C. C. 563 and 189 I. C. C. 79. Cf. Keeshin Transcon. Freight Lines, Inc.—Debentures, 5 M. C. C. 349, 351. In fact, the Commission has said that § 20 (a) (2) "confers upon us power to grant or deny authority to issue securities or to assume obligation or liability . . . only upon ap-

plication by the carrier for such authority." New York Central R. Co. Assumption, 158 I. C. C. 317, 322.

In the Commission's view, authority to consolidate includes the authority to acquire and operate properties of other roads, but neither that authority nor the authority to issue securities upon consolidation includes authority to assume liabilities of the constituent companies. Rock Island System Consolidation, 193 I. C. C. 395, 403–04; Santa Fe Trail Transp. Co.—Merger, 5 M. C. C. 324, 328; cf. Illinois Terminal R. Co. Consolidation and Securities, 221 I. C. C. 676. The Court's suggestion that this was not so before the Commission promulgated its general plan of consolidation under § 5, is contrary to the ruling in Acquisition & Stock Issue by P., O. & D. R. R., 105 I. C. C. 189. In that case, before the promulgation of the plan, the Commission was at pains to warn (p. 193) that its approval of an issue of securities to carry out a consolidation under state law did not involve any decision on assumption of liability of the obligations of the consolidated company's constituents. Assumption of Obligation by L. S. & I. R. R., 86 I. C. C. 640, and Grand Trunk W. R. Co. Unification and Securities, 158 I. C. C. 117, 138, 142–43, both decided before the promulgation of the plan, granted permission to assume the obligations of the constituents and thus gives further proof that the Commission, when it intended to take any position with respect to the assumption of obligations in connection with a consolidation, did so by action affirmatively expressed rather than by silence.

The Commission has entertained applications for the approval, under § 1 of the Act, of the operation of acquired properties, or for approval of security issues upon consolidation, without any application for the approval of the assumption of the liabilities involved. See Acquisition and Stock Issue by N. Y., C. & St. L. R. Co., 79 I. C. C. 581; Pacific Coast R. Co. Acquisition, 187

I. C. C. 563; cf. Rock Island System Consolidation, 193 I. C. C. 395, 403–04. And in the case of this appellant, as of other roads, it has later entertained and disposed of separate applications for the approval of the assumption of the obligations involved. N. Y., C. & St. L. R. Co. Assumption of Obligation, 217 I. C. C. 598; N. Y., C. & St. L. R. Co. Bonds and Assumption, 221 I. C. C. 772; N. Y., C. & St. L. R. Co. Assumption of Obligation and Liability, 247 I. C. C. 71; St. Louis-S. F. Readjustment, 145 I. C. C. 218; Pacific Coast R. Co. Securities, 189 I. C. C. 79; Cincinnati Union Term. Co. Securities, 166 I. C. C. 419 and 499, and 184 I. C. C. 619; West Jersey & S. R. Co. Bonds, 217 I. C. C. 125; cf. Assumption of Obligation by N. O., T. & M. Ry., 94 I. C. C. 218.

Such action by the Commission plainly precludes any inference that, in approving an application for the operation of the consolidated lines or an issue of securities under a consolidation, it was doing more than responding to the petition presented to it or that it was undertaking to pass on the legality or propriety of the assumption by the consolidated road of guarantee obligations of its constituent companies. We are pointed to nothing suggesting that the Commission has ever regarded such approvals as involving an unasked determination with respect to the assumption by the consolidated carrier of the obligation of its constituent companies.

There is thus no plausible ground for saying that there was lurking in the Commission's decision in 79 I. C. C. 581 some implied ruling as to the construction of § 20 (a) (2) and some implied refusal to act because of that construction, in a situation in which it was not asked or expected to act and in which, for reasons already stated, it was under no duty to act. In none of the cases cited in the opinion of the Court as hinting at a possible construction by the Commission of § 20 (a) (2) was it asked to make any finding or order with respect to the assump-

tion by appellant of obligations of its constituent companies. In none did it make or decline to make any of the findings or the order required by § 20 (a) (2) with respect to such obligations. In none did it express any opinion whether obligations attaching to a consolidated carrier are within the prohibition of the statute, or as to its duty to approve or disapprove of their assumption.

In Operation of Lines and Issue of Capital Stock by the N. Y., C. & St. L. R. Co., 79 I. C. C. 581, the Commission was asked to, and did, specifically approve the operation by appellant of the consolidated line and the issuance of certain stock by appellant, pursuant to the consolidation plan, and nothing more. It made no mention of any assumption of obligation by appellant or of the assumption provisions of § 20 (a) (2). It neither took nor declined to take action affecting such assumption. For all that appears, the Commission, in its examination of the capital structure and the balance sheet of appellant, may have disregarded the guarantee obligation as one not affecting the consolidated company because its assumption had not been approved by the Commission.

It construed the consolidation provisions in § 5 of the Act as permitting carriers to consolidate under state law without first securing the Commission's authorization for the consolidation itself. Whether or not this was the necessary interpretation of the consolidation provisions, cf. *Snyder* v. *New York, C. & St. L. R. Co.*, 278 U. S. 578, nothing in the report of the Commission's decision suggests that if it was essential, in order to carry out the consolidation under state law, that obligations be "assumed," then the assumption could be accomplished without compliance with § 20 (a) (2). Its decision is in fact inconsistent with any such theory, and affords affirmative evidence that the Commission thought § 20 (a) (2)

was operative notwithstanding the narrow interpretation which it gave to § 5.

The Commission authorized appellant to issue, under § 20 (a) (2), certain preferred and common stock, to be exchanged for the stock of its five constituent companies in carrying out the consolidation. If consolidations under state law could, in the Commission's view, be effected at that time wholly without regard to § 20 (a) (2), then the granting of authority to issue the stock would have been superfluous. That the Commission deemed such authority necessary is persuasive that it regarded § 20 (a) (2) as applicable to all issues of securities, or assumptions of obligations, which occurred in connection with a consolidation. Freedom to consolidate, in the Commission's view, plainly did not include freedom to make adjustments in capital structure without the authorization required by § 20 (a) (2). Hence, the only real question is whether an obligation assumed or attaching merely by operation of law is an "assumption" within the meaning of § 20 (a) (2)—a question which, as will presently appear, the Commission has consistently answered in the affirmative, whenever it has been called upon to give an answer.

Subsequent proceedings before the Commission affecting appellant, in the cases on which the Court relies, presented no question of its liability upon the guarantee obligations of its constituent companies, and are equally barren of any indication that the Commission considered the meaning and application of the assumption provisions of § 20 (a) (2) or that it had any occasion to do so. In N. Y., C. & St. L. R. R. Bonds, 82 I. C. C. 365, and in Pledge of Bonds by N. Y., C. & St. L. R. R., 86 I. C. C. 465, next cited by the Court as sustaining its decision, the questions presented to the Commission had not even a remote relation to any assumption by appellant of guarantee obligations, resulting from the consolidation, which the

Commission had not by its order approved. In the one case the application was for authority to make a new bond issue; in the other for permission to pledge some of its own assets to secure a new note issue. Passing references by the Commission, in recounting the history of the consolidation, to the fact that appellant had acquired the properties of constituent companies "subject to all their debts, obligations and liabilities," and that it "has assumed all obligations" of a different constituent company from that here involved, can hardly be accepted as evidence of an unasked administrative construction of a provision of a statute which it was not administering and with respect to which it expressed no opinion.

The Court gains no support for its conclusion from the supposed recognition by the Commission, in the Akron case, that the "resulting liability" from appellant's consolidation had been "apparently admitted." Akron, C. & Y. Ry. Co. & Northern O. Ry. Co. Reorganization, 228 I. C. C. 645, 647. The bankruptcy reorganization, whose approval by the Commission was there sought, was that of the Northern Ohio Railway, the guarantee of whose bonds is presently involved. What had "apparently" been "admitted" by the proposed reorganization was that, so far as appellant should perform or be compelled to perform the guarantee, it would become a creditor of the new company, entitled to participate in the new securities to be issued to creditors under the reorganization. The only action taken by the Commission with respect to the obligation was to approve (p. 673) the provision of the plan, which reserved new securities of the reorganized company for the satisfaction of appellant's claim "pending performance," if any, of the guarantee, by appellant, and to order (p. 684) the reorganized company to issue to appellant its proportion of the new securities upon "appropriate proof" by appellant "of loss sustained in the performance of its contract of guarantee." The Commission thus had no oc-

casion to determine the question which appellant asks to have determined here, and pointedly left it undecided. Obviously, the approved plan gave appellant a powerful incentive to resist performance of the guarantee and manifestly did not purport to foreclose appellant from securing the adjudication of the liability which it seeks here.

Not only do these cases fail to disclose any self-denying construction of § 20 (a) (2) by the Commission, but in others, where the Commission has been called on to consider the question, it has taken the position that the word "assumption" in § 20 (a) (2) includes an obligation placed upon the carrier merely by operation of the state law under which it had acquired property.

Three times since its decision in 79 I. C. C., the Commission has granted the application of appellant to be permitted to extend and also to assume obligations of its constituent companies. N. Y., C. & St. L. R. Co. Assumption of Obligation, 217 I. C. C. 598; N. Y., C. & St. L. R. Co. Bonds and Assumption, 221 I. C. C. 772; N. Y., C. & St. L. R. Co. Assumption of Obligation and Liability, 247 I. C. C. 71. In two of these cases, the Commission authorized appellant to assume obligations of the Lake Erie & Western—the same constituent company whose obligation is now said to have been assumed without the necessity of the Commission's authorization. If appellant was already personally liable on the obligations, permission to assume them was unnecessary. And since the Commission does not entertain applications for authority to assume obligations where it is of the opinion that the obligation is not one to which § 20 (a) (2) applies, Southern Pacific Co. Assumption of Obligation, 189 I. C. C. 212, 213; Bonds of A. & M. Railway Bridge & Term. Co., 94 I. C. C. 79, 81; Missouri-K.-T. R. Co. Assumption of Obligation, 212 I. C. C. 217; Pittsburgh & Shawmut R. Co. Securities, 166 I. C. C. 503, 505, its action in authorizing the assumptions, in addition to the extensions, is inconsistent with any in-

ference on our part that it had previously ruled that the obligations assumed were not required to comply with § 20 (a) (2).

On the contrary, the Commission applied that section to obligations like the present soon after enactment of the Transportation Act of 1920. In Assumption of Obligation by Hudson River Connecting R. R., 72 I. C. C. 595, decided nine months before its decision in 79 I. C. C., the Commission took jurisdiction of an application for approval of an assumption of obligation resulting by operation of New York law from a carrier's acquisition of property. In granting the application and in authorizing the carrier to "assume" the attached obligation the Commission stated, page 596:

"While the applicant does not propose to make any indorsement on the bonds, or execute any agreement in respect of the payment of them, it appears that, under the laws of New York, the acceptance of a deed conveying land subject to a mortgage indebtedness, which the grantee agrees to assume, has the effect of making the land the primary fund for the payment of the mortgage indebtedness, so that the grantee becomes the principal debtor and the grantor a surety."

The Commission made the findings prescribed by § 20 (a) (2) and ordered that the applicant be "authorized to assume obligation and liability" in respect of the mortgaged bonds, "said assumption of obligation and liability . . . to be accomplished by the acceptance by the applicant of a deed of said lands."

More recently, in Public Service Coordinated Transport—Assumption of Obligation, 15 M. C. C. 406, a motor carrier case under § 214 of the Interstate Commerce Act, which incorporates by reference § 20 (a) (2), the Commission reaffirmed its earlier construction of § 20 (a) (2) as applying to obligations like the present, saying (p. 408):

"Prior to consummation of the merger, applicant's liability in respect of the bonds of said companies was of a contingent nature. Under the statutes of New Jersey all debts and liabilities of merged or consolidated corporations shall thenceforth attach to the consolidated corporation and may be enforced against it to the same extent as if said debts and liabilities had been incurred or contracted by it. Thus, through completion of said merger, applicant has, by operation of law, become the principal obligor in respect of these bonds, and, as such, has obligations and liabilities in respect thereof which differ from the contingent liability previously existent. In our opinion assumption of such obligations and liabilities as successor in title is a matter over which we have jurisdiction." [2]

While courts are not necessarily bound by the Commission's construction of the Interstate Commerce Act, *Mitchell* v. *United States*, 313 U. S. 80; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 282 U. S. 311, they rightly pay deference to the Commission's considered construction of it, especially when it is of long standing and has

---

[2] See also Elmira & L. O. R. Co. Acquisition, 170 I. C. C. 127, where the Commission approved an "assumption" of liability which was apparently to attach (see p. 128) solely by operation of the New York stock corporation laws. Cf. Assumption of Obligation by L. S. & I. R. R., 86 I. C. C. 640, where in authorizing an "assumption" the Commission stated: "Under the agreement and the laws of Michigan the debts, liabilities, and duties of the last two companies named attach to the applicant and are enforceable against it to the same extent and in the same manner as if originally incurred by it. The applicant accordingly seeks authority to assume obligation and liability in respect of the securities of these companies." Cf. also Union R. Co. Assumption of Obligation and Liability, 217 I. C. C. 635, where, in authorizing an assumption the Commission stated: "Pursuant to the terms of the joint agreement of merger dated October 1, 1936, and the provisions of the laws of the Commonwealth of Pennsylvania, the applicant will assume all the debts and obligations of the" constituent corporations.

never been departed from. But it is novel doctrine that a provision of an act of Congress may be nullified by a construction of the Interstate Commerce Commission which can be inferred only from the fact that the Commission ignored the provision in a proceeding in which, by its settled practice, it was not called upon to construe or apply it. Certainly, the Commission does not appear ever to have acted upon any such view, nor has it come before us to advocate it. It seems plain that the rulings of the Commission that § 20 (a) (2) is applicable to those obligations which state law attaches to the carrier in consequence of its participation in a consolidation, as well as to those which attach to it by reason of its expressed promise, carry out the purposes of the statute and are consistent with its language. Section 20 (a) (2) was enacted to prevent the imposition on the railroads of the country, through consolidation or otherwise, personal liability for the obligations of other roads, such as had occurred in certain well known consolidations notorious for their disregard of the interests of security holders and the public. See 58 Cong. Rec. 8317–18. As the effective means of prevention it prescribed that all such obligations should be void, unless the Commission orders their approval as compatible with the public interest.

But even if we assume that the silence of the Commission in 79 I. C. C. can be taken to intimate a view of the meaning of § 20 (a) (2), with respect to which it took no action and made no order, it seems still more novel to say that such an inference must control our decision here, in the face of its explicit construction of the statute in other cases as applicable to situations like the present. Even sporadic and inconsistent administrative decisions, where the parties have relied upon them, may sometimes both be followed by courts when applied to those parties. But the unarticulated intimations of opinion of an administrative body, unacted upon, are too inconclusive

to control judicial decision. Courts are not like weather-cocks, changing with every administrative wind that blows. They cannot on the same day rightly decide that the same statute means different things in different cases, merely because the Commission may on different days have had shifting impressions which it has not thought sufficiently important to express in any ruling, opinion, decision or order.

*United States* v. *Chicago North Shore R. Co.*, 288 U. S. 1, upon which the Court relies, has no significance here. It is one thing to accept judicially the Commission's decision that a particular carrier is an "interurban electric railway," a determination unquestionably within its power and peculiarly within its administrative competence. It is quite another to bind the courts by a construction of the statute which the Commission has never voiced, but which, on the contrary, it has consistently denied, namely, that obligations may be assumed without conscious and express permission of the Commission and in defiance of the declared will of Congress.

It is impossible to believe that the all-inclusive provisions of § 20 (a) (2), passed in response to a general and long-felt need for the federal regulation of railroad capitalization, were intended to exclude assumptions of obligations which attach by virtue of state law. The statute makes § 20 (a) (2) subject only to one exception—short-term notes maturing in not more than two years, § 20 (a) (9)—and even in that instance the carrier is required to file with the Commission a certificate of notification. No other exception was provided, and it is apparent that none was intended.[3]

---

[3] Examination of the historical background of § 20 (a) can leave no genuine doubt that the financial provisions of § 20 (a) (2) were meant to be all-inclusive. Abuses in railroad financing had been a continuous subject of public concern. See the report of the Windom Committee in 1874, S. Rep. No. 307, 43rd Cong., 1st Sess., Vol. I, pp. 71-76; the

We are not concerned here with doubts whether appellant is validly organized under New York law. No such issue is presented by the record. The only question before

report of the Cullom Committee in 1886, S. Rep. No. 46, 49th Cong., 1st Sess., part I, pp. 51–52. In 1907 the Interstate Commerce Commission, reporting upon its investigation of the Union Pacific and the Chicago & Alton railroads, recommended federal regulation of security issues. In re Consolidations and Combinations of Carriers, 12 I. C. C. 277; and see also the Commission's Annual Report for 1907, p. 24. In 1910 President Taft urged upon Congress federal regulation of railroad securities, 45 Cong. Rec. 380, but the Senate's opposition prevented the proposal from being included in the Mann-Elkins Act. In 1913 the Commission concluded its New England Investigation, 27 I. C. C. 560, 616, with the recommendation that "No interstate railroad should be permitted to lease or purchase any other railroad, nor to acquire the stocks or securities of any other railroad, *nor to guarantee the same, directly or indirectly*, without the approval of the federal government." Senate opposition again proved too strong in 1914, as well as in 1916, but by the end of the war opposition to the regulation of railroad capitalization practically disappeared. See Locklin, Regulation of Security Issues by the Interstate Commerce Commission, pp. 12–22; Sharfman, The Interstate Commerce Commission, Vol. I, pp. 86–94, 189–93; and the Commission's Annual Report for 1919, pp. 4–5.

Section 20 (a) when finally enacted was thus a thoroughgoing reform, long considered and at last virtually unopposed, designed to vest in the Commission "exclusive and plenary" jurisdiction, § 20 (a) (7), over changes in the capital structures of the railroads. Its enactment, see Sharfman, *op. cit., supra*, Vol. I, p. 190, "was not only a fulfilment of the Commission's repeated recommendations, but grew out of a practical unanimity of opinion among the numerous and diverse interests that sought to influence the character of the new legislation. While this extension of the Commission's authority was designed, indirectly, to protect the investing public against the dissipation of railroad resources through faulty or dishonest financing, its dominant purpose was to maintain a sound structure for the rehabilitation and support of railroad credit, and for the consequent development of the transportation system. It aimed to render impossible the recurrence of the various financial scandals, with their destruction of confidence in railroad investment, which had become notorious, and to prevent the subordination of the carriers' stake as transportation agencies to the financial advantage of alien interests."

us is whether personal liability can be assumed by appellant without complying with the statute, which makes such an assumption void "even though permitted by the authority creating the carrier corporation" "unless and until, and then only to the extent that" the Commission has approved the assumption after making the prescribed findings.

The statute does not deprive the holders of obligations of the constituent companies of any rights against them or their property. It only prevents the acquisition by such holders, contrary to the public interest, of new rights against the consolidated carrier without the consent of the Commission, and by § 20 (a) (11) the statute gives a remedy to those who, like appellee, become innocent purchasers of such securities, after consolidation, for the loss of such rights through the operation of § 20 (a) (2). The application of the statute in this case no more involves enriching stockholder equities than in any other. The question in every case is whether the public, and railroad security holders, shall be burdened, through repeated reorganizations of railroads, with excessive indebtedness which it was the purpose of the statute to prohibit. It is obvious that the statute would fail of its proclaimed purpose unless, as the Commission has ruled, its prohibitions extend to those obligations which the consolidated carrier assumes by virtue of its entering into a consolidation under state law, as well as those which it assumes by its expressed promise. The words of the statute neither compel nor persuade to the decision now given, which seems to rest on nothing more substantial than a far-fetched surmise. It defeats the Congressional purpose and conflicts with the legislative history and administrative construction of the statute.

MR. JUSTICE REED, MR. JUSTICE FRANKFURTER and MR. JUSTICE BYRNES join in this opinion.