C. Herman TERRY, as Trustee of and on Behalf of the C. HERMAN TERRY AND MARY VIRGINIA TERRY CHARITABLE REMAINDER UNITRUST, Plaintiff,

v.

Russell YAMASHITA, Securities Commissioner of the State of Hawaii, and International Holding Capital Corp., a Hawaii corporation, Defendants.

Civ. No. 85–1434.

United States District Court, D. Hawaii.

June 13, 1986.

Paul Lynch, Mark S. Milker, Case, Kay & Lynch, Honolulu, Hawaii, and Mitchell Legler, Linda Kelso, Gerdner Davis, Jacksonville, Fla., for plaintiff.

Paul Sato, Wallace S. Fujiyama, James W. Boyle, Thomas R. Sylvester, Robert P. Takushi, Honolulu, Hawaii, for defendants.

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION DENYING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

FONG, Chief Judge.

In this action the plaintiff Mr. Terry, in his capacity as trustee of the C. Herman Terry and Mary Virginia Terry Charitable Remainder Unitrust, has on November 25, 1985 moved for a preliminary injunction, seeking both a declaration that the Hawaii Control Share Acquisition Statute, sections 416–171 and 416–172 Hawaii Revised Statutes, violates the United States Constitution, and a preliminary injunction restraining the defendants from enforcing it. The plaintiff is a resident of the State of Florida.

On December 7, 1985 defendant International Holding Capital Corp. ("IHCC") also moved for a preliminary injunction, seeking an order restraining Mr. Terry from acquiring any additional IHCC stock until Mr. Terry complies with the Hawaii Control Share Acquisition statute ("Hawaii CSA statute".)

Russell Yamashita, the Securities Commissioner of the State of Hawaii is no longer a defendant in this action. A stipulation to dismiss defendant Yamashita was filed in the Ninth Circuit on April 4, 1986.

On June 10, 1986, these motions for preliminary injunctions were argued before

this court. Paul Lynch and Mark S. Milker represented plaintiff Mr. Terry, and Paul Sato appeared and represented defendant IHCC.

The court having reviewed counsels' memoranda in support and in opposition to the cross-motions for preliminary injunctions and having considered the affidavits and other exhibits in the record and being advised of the premises, finds as follows:

## FINDINGS OF FACT

IHCC, incorporated under the laws of the State of Hawaii on August 28, 1984, is a publicly held unitary stock holding company whose major asset is all of the capital common stock of International Savings & Loan Association, a Hawaii chartered savings and loan association. The common stock of IHCC is nationally traded over the counter on the National Association of Securities Dealers Automated Quotation system ("NASDAQ").

As of August 1985, the total number of issued IHCC shares was 822,040. In December 1985, IHCC issued an additional 175,000 shares, increasing the total number of issued shares to 997,040.

IHCC falls within the Hawaii CSA statute's definition of an "issuing public corporation," because it is incorporated in the state of Hawaii, has more than one hundred shareholders, and its principal place of business is located within the state. § 416–171 Hawaii Rev.Stat. (1985).

Mr. Terry owns approximately 10.03% of the current total of 997,040 issued shares. Defendant argues that Mr. Terry's IHCC stock was acquired in contravention of the Hawaii CSA statute, § 416–171 and § 416–172 Hawaii Rev.Stat. (1985).

Both parties represented to the court at the June 10, 1986 hearing that no material issues of fact are in dispute.

In the first week of June 1985, Mr. Terry acquired a total of 66,000 shares, about 8% of the 822,040 shares of IHCC stock then issued. He then filed his initial Schedule 13D with the Securities and Exchange Commission ("SEC"), stating that his purchases were for "investment purposes."

On August 2, 1985, he filed an amended Schedule 13D which reflected additional stock purchases giving him 9.97% of IHCC's authorized and issued stock.

Mr. Terry has made all the filings required by section 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m (1982).

On October 18, 1985, Mr. Terry received permission from the Federal Home Loan Bank Board ("FHLBB") to acquire up to 25% of IHCC's issued and outstanding stock.

On November 20 through 22, 1985 Mr. Terry bought an additional 11,000 shares of IHCC stock, raising his ownership to a total of about 11.3% of IHCC's issued stock. This passed the 10% stock ownership threshold at which point the Hawaii CSA statute would require Mr. Terry to provide IHCC with an information statement and wait for a shareholder vote.

The complaint in this action was filed on November 18, 1985. On that date, Mr. Terry held 9.98% of the total common stock issued by IHCC. Mr. Terry alleged that the Hawaii CSA statute was unconstitutional, and asked that the Hawaii Commissioner of Securities and IHCC be enjoined from enforcing the statute.

On November 22, 1985, Mr. Terry filed a motion for a TRO in which he admitted that he had already purchased an additional 11,000 shares of stock, bringing his holdings to 11.3% of the total IHCC shares, in violation of the statute.

On November 25, 1985, Judge Phillip T. Chun, of the First Circuit Court for the State of Hawaii issued a TRO enjoining C. Herman Terry, as Trustee of the Terry Unitrust ("Mr. Terry") from further acquisitions of IHCC common stock in a related Hawaii State court action, *IHCC v. Terry & Bishop Trust Co., Ltd.*, Civil 85–4454 (the "State Court Action").

That TRO was extended by stipulation of the parties, and expired at 5:00 p.m. on December 16, 1985.

Mr. Terry then filed a motion for preliminary injunction, to be heard on December 16, 1985. Upon IHCC's motion, the hearing was continued to December 30, 1985.

Between December 16 and December 30, 1985, IHCC issued an additional 175,000 shares and drew up a warrant that can be exercised for an additional 100,000 shares. This increased the number of issued IHCC shares to a total of 997,040. If the warrant is exercised, the number will increase to 1,097,040.

On December 30, 1985, visiting Federal Judge Robert Belloni heard argument on a motion for preliminary injunction, which he took under advisement. On January 3, 1986, Judge Belloni granted defendant IHCC's request for abstention under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The decision was appealed to the Ninth Circuit on January 3, 1986.

On January 7, 1986, state court Judge Honda took IHCC's motion for preliminary injunction under advisement. On February 6, 1986, Mr. Terry bought 7,000 more shares of IHCC, bringing his total holdings to about 10.03% of IHCC's issued stock. Later that day, in a statement not recorded by a court reporter, Judge Honda orally granted IHCC's motion, enjoining Mr. Terry from buying more than 10% of IHCC's stock, but not setting any bond. Counsel have represented to this court that they were notified of Judge Honda's decision by way of a telephone call from Judge Honda's law clerk. This decision was apparently reflected in a minute order, but Judge Honda has not yet filed a written order.

On May 16, 1986, the Ninth Circuit reversed Judge Belloni's decision to abstain and decided that there are no grounds which would justify abstention. The Ninth Circuit remanded the case to this court, asking this court to consider all pending requested relief.

## CONCLUSIONS OF LAW

### I

In the Ninth Circuit, the standard for evaluating a motion for a preliminary injunction permits the moving party to meet its burden by demonstrating either: 1) probable success on the merits and a possible irreparable injury; or 2) sufficiently serious questions going to the merits as to make them fair ground for litigation and with a balance of hardships tipping decidedly in the movant's favor. *Ebel v. City of Corona*, 698 F.2d 390, 392 (9th Cir.1983); *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir.1980).

These tests are merely extremes of a single continuum. Either formulation is satisfactory. *People of the Village of Gambell v. Hodel*, 774 F.2d 1414, 1419 (9th Cir.1985).

Mr. Terry has argued that he has a high probability of success on the merits, because the Hawaii CSA statute violates both the Commerce Clause and the Supremacy Clause of the United States Constitution, and is impermissible as both a direct and an indirect burden on interstate commerce. Mr. Terry therefore seeks to enjoin the enforcement of the Hawaii CSA statute.

IHCC has made the reciprocal argument, that it has a high probability of success on the merits because the Hawaii CSA statute does not violate the U.S. Constitution. Therefore, IHCC seeks to enjoin Mr. Terry's violation of the Hawaii CSA statute.

To show a probability of prevailing on the merits, Mr. Terry must show the likelihood of a constitutional violation causally related to the result sought to be enjoined. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 565 (6th Cir.1982); *Wilson v. Thompson*, 593 F.2d 1375, 1384 (5th Cir.1979).

### II

The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... among the several States ..." Article 1, § 8, cl. 3. The Commerce Clause is a limitation upon the power of the states. *Great Atlantic & Pacific*

*Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976).

■ When a state statute directly regulates transactions which take place across state lines, or transactions which take place wholly outside the regulating state, the statute is an impermissible direct restraint on interstate commerce. *Edgar v. MITE Corp.,* 457 U.S. at 641–42, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982). The Supreme Court's reliance on the *Edgar v. MITE* opinion as authority for its recent decision on this point in *Brown-Forman Distillers Corp. v. New York State Liquor Authority,* — U.S. —, —, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) indicates that a majority of the Court has now squarely disapproved of such a direct regulation on interstate commerce.

IHCC is a publicly held corporation. Thirty-two percent of its stockholders are Hawaii residents. The rest of the stockholders appear to be residents of various other states scattered across the United States.

Mr. Terry had obtained authorization from the FHLBB to purchase up to 25% of IHCC's issued shares. It is entirely possible that all persons whose shares he purchased would be residents of states other than Hawaii. Furthermore, shares of IHCC are publicly traded through the NASDAQ system. Transactions between residents of different states and transactions performed through the NASDAQ system would occur in interstate commerce.

The Hawaii CSA statute, unless complied with, would altogether prevent Mr. Terry from purchasing shares, even those originally owned by non-Hawaii residents, if a majority of the other shares failed to vote in favor of his purchase.

In addition, the Hawaii CSA statute on its face would apply even if none of the issuing corporation's shareholders were residents of Hawaii, because the statute would apply to every purchase from a corporation incorporated in Hawaii "with at least one hundred shareholders and having its principal place of business or substan-

tial assets located in this State." § 416–171 Hawaii Rev.Stat. (1985).

■ As has long been recognized, the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.,* 457 U.S. at 642, 102 S.Ct. at 2641, 73 L.Ed.2d 269 (1982); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945).

■ Needless to say, hampering interstate commerce in this manner is impermissible when the benefits sought are readily obtainable through less burdensome legislation. Because the Hawaii CSA statute has an extraterritorial effect and can be applied to regulate purchases even when no shareholder is a resident of the regulating state, it comprises a direct burden on interstate commerce and is invalid.

### III

■ A state statute that has an indirect impact on interstate commerce can be valid if it evenhandedly regulates to further a legitimate state objective relevant to local interests and the impact on interstate commerce is incidental, unless the burden imposed on such commerce is excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925).

The state does have a legitimate interest in protecting Hawaii shareholders, but the benefits which the statute provides for the shareholders must be weighed against the burdens it imposes on interstate commerce.

The Hawaii CSA statute would provide several local benefits. Under the statute, shareholders in Hawaii corporations would get additional information about persons seeking to acquire more than 10% of the stock in the corporations whose shares they hold. They could arguably command a higher price if they wish to sell their

shares, because once they are aware that a purchaser is seeking to acquire a control share in the corporation, the selling shareholders would be able to command a price that would include a control premium. In addition, it is argued that the statute will induce businesses to incorporate in Hawaii, and the state does have a legitimate interest in enhancing its local business climate.

As previously discussed, however, the Hawaii CSA statute imposes a significant burden on interstate commerce. The statute not only seeks to regulate the information disclosed and the timing of a purchaser's acquisition of shares in an issuing corporation but also seeks to prevent a purchase of shares altogether if the other shareholders fail to approve the purchase. Since IHCC shares are publicly traded in the over the counter market through the NASDAQ system, the Hawaii CSA statute as applied could prevent sales of shares occurring between shareholders who are not Hawaii residents.

Affiants in the case at bar acknowledge that as of November 1985, only 32% of the IHCC shareholders were known to be Hawaii residents. A number of shares are held in street address alone, with no indication of the residency of the beneficial owners of the shares. Because the street addresses are located outside Hawaii and there is no evidence indicating that the owners of these shares are Hawaii residents, the court will not speculate that those shares might be held by Hawaii residents.

■ Because Hawaii has no legitimate interest in protecting nonresident stockholders, the loss of their opportunity to sell their IHCC stock at a premium should not be calculated in the balance between burdens and local benefits. This claimed benefit of the statute is further diluted in view of the fact that the statute exempts acquisitions of shares under Chapter 417 Hawaii Rev.Stat. (1985), governing corporate takeovers, if the issuing public corporation is a party to the transaction, and acquisitions of control shares from the issuing public corporation. §§ 416–171(4) and (5) Hawaii

Rev.Stat. (1985); *Telvest v. Bradshaw*, 697 F.2d 576 (4th Cir.1983).

Finally, the argument that the Hawaii CSA statute would have a beneficial effect by inducing businesses to incorporate in the state is purely speculative. No evidence in the record supports this proposition.

Accordingly, the court finds that the Hawaii CSA statute is also unconstitutional because the benefits of the statute to the State of Hawaii are outweighed by its indirect burdens on interstate commerce.

## IV

■ A state statute is preempted by federal law in either of two situations: (1) where "compliance with both federal and state regulations is a physical impossibility." *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or (2) where "the purpose of the federal statute would to some extent be frustrated by the state statute." *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.*, 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84 (1963).

Through the Williams Act, 82 Stat. 454, codified at 15 U.S.C. §§ 78m(d), (e) and 78 n(d)-(f) (1982), Congress in 1968 amended the Securities Exchange Act of 1934 to add §§ 13(d), 13(e), and 14(d)-(f). The Williams Act was enacted primarily to extend existing federal disclosure requirements to the regulation of cash tender offers in corporate control contests. Because Mr. Terry's purchases of IHCC stock were made in the open market and not at premium prices, without fixed terms, and were not contingent upon the tender of a fixed minimum number of shares, his accumulation of shares did not bear the indicia of a tender offer made during a take-over attempt. *S.E.C. v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945, 952 (9th Cir.1985).

However, stocks issued by IHCC are registered pursuant to § 12 of the Securities and Exchange Act, 15 U.S.C. § 78*l* (1982). Therefore, § 13(d) of the Williams Act is

applicable, and any purchaser of IHCC shares whose purchases have exceeded 5% of the outstanding shares must file a Schedule 13D with the SEC within 10 days. 15 U.S.C. § 78m(d) (1982).

When Congress enacted the Williams Act, it intended to protect shareholders and to avoid favoring either the acquiring takeover bidder or the target company's management. The legislative history indicates that the United States Senate had taken "extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids." 113 Cong.Rec. 24664 (1967) (quoted in *Edgar v. MITE Corp.*, 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982)).

This policy of even-handedness has been recognized by the United States Supreme Court in *Edgar v. MITE Corp.*, 457 U.S. at 633, 102 S.Ct. at 2636 and in *Piper v. Chris-Craft Industries, Inc.* 430 U.S. 1, 31, 97 S.Ct. 926, 944.

Under the Williams Act, Congress required a person seeking to purchase more than 5% of a corporation's stock to furnish the other shareholders and the management of the target company with adequate information, but there was no congressional intent to do more than give the incumbent management an opportunity to express and explain its position. *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982) (citing *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Once that opportunity was extended, the policy of the Williams Act is to allow the person seeking to acquire more shares as well as the other shareholders the freedom to move forward within the time frame provided by Congress. *Id.*

Section 416–172(b) of the Hawaii CSA statute provides that the person seeking to acquire additional shares must provide much the same information as is required under the Williams Act at 15 U.S.C. § 78m(d)(1) (1981 ed.); 17 C.F.R. § 240.-13d–1 (1982).

Under the Williams Act, after the purchase has been made, the acquirer must provide information which the SEC prescribes as appropriate in the public interest or for the protection of investors. In addition to information that can be required under the Williams Act, the Hawaii CSA statute requires that the potential purchaser also specify:

(A) the resulting percentage of voting power the purchaser would have in the election of directors if the purchaser were allowed to acquire the shares,

(B) any plans of the purchaser to liquidate the issuing public corporation, sell its assets, merge it, change its business activities, or alter its relationships with suppliers, customers or the communities in which it operates,

(C) and "such other information which would affect the decision of a shareholder with respect to voting on the proposed control share acquisition."

The language of the Hawaii CSA statute does not set any parameters limiting the additional information which could be demanded, and does not specify who will have the authority to decide that any additional information is necessary. Because the information statement is to be delivered to the principal executive office of the issuing corporation, it appears that the statute would enable the management of the issuing corporation to have the power to decide what additional information a prospective acquirer would be required to disclose.

Under the Hawaii CSA statute, the acquirer must provide this information *before* buying the shares which increase the acquirer's holdings to over 10% of the target company's shares whereas the Williams Act requires that it be provided within ten days *after* the purchase.

The Hawaii CSA statute requires a shareholder meeting within 30 to 55 days after the information statement is mailed to the shareholders, with a statement from management. A proxy solicitation must be delayed for 30 days, and must be mailed separately from the information statement.

The acquirer is blocked from buying the additional shares above the 10% threshold unless the other shareholders vote a majority of the shares to affirm his purchase. The acquirer's shares cannot be voted in this election. No provision of the statute imposes a deadline within which the shareholder vote must be completed.

■ It appears that the provisions of the Hawaii CSA statute conflict with the federal statutes governing control share acquisitions. The fact that the prospective purchaser must wait for a shareholder vote before he is allowed to buy the shares and the fact that, unless the other shareholders approve, he cannot buy the shares at all, conflict with the relevant provisions of the Williams Act.

■ The fact that there is no deadline for the tallying of the shareholder vote could permit management to delay the purchase as long as they desired to do so. This aspect of the Hawaii CSA statute also conflicts with the federal statutory plan.

However, the court will not reach the issue of whether the Hawaii CSA statute violates the Supremacy Clause, because we have already decided that it is constitutionally infirm as a result of its violation of the Commerce Clause.

V

Having decided that the plaintiff has demonstrated probable success on the merits, the court turns to a consideration of the possibility of irreparable injury in this case.

One harm that will occur if the injunction sought by Mr. Terry is not granted is the assertion of the penalty provisions of the unconstitutional Hawaii CSA statute. The statute provides that all shares acquired by an acquiring person in violation of § 416–172(e) Hawaii Rev.Stat. (1985) shall be denied voting rights, cannot be voted, transfered, or posted as security. § 416–172(b) Hawaii Rev.Stat. (1985).

In addition, IHCC can buy back all shares Mr. Terry has acquired in contravention of the statute for the price Mr. Terry paid for them or for book value, whichever is less. Because IHCC has the power to lower the book value of the shares by issuing more shares, it is inequitable to allow the corporation to benefit through diluting the book value of its shares.

In addition, money damages cannot compensate Mr. Terry for the business opportunities lost during the litigation of the constitutionality of the Hawaii CSA statute. *Martin-Marietta Corp. v. Bendix,* 690 F.2d 558, 568 (6th Cir.1982).

Accordingly, because the plaintiff has demonstrated a high probability of success on the merits and the possibility of irreparable injury, the court hereby GRANTS plaintiff Mr. Terry's Motion for Preliminary Injunction and ORDERS that the enforcement of the Hawaii Control Share Acquisition Statute § 416–171 and § 416–172 Hawaii Rev.Stat. (1985) be enjoined pending the final resolution of this lawsuit.

It is further ordered that defendant International Holding Capitol Corporation's Motion for Preliminary Injunction is hereby DENIED.

Plaintiff's motion for a permanent injunction under FRCP Rule 65(a)(2) has also been considered by this court. Because additional factual contentions which may be material need be resolved before final resolution of this case, that motion will be DENIED.